NACCO INDUSTRIES, INC. and HB–PS Holding Company, Inc., Plaintiffs,

v.

APPLICA INCORPORATED, Harbert Management Corporation, HMC Investors, L.L.C., Harbinger Capital Partners Offshore Manager, L.L.C., Harbinger Capital Partners Master Fund I, Ltd., HMC—New York, Inc., Harbinger Capital Partners Special Situations GP, LLC, Harbinger Capital Partners Special Situations Fund, L.P., APN Holding Company, Inc., and APN Mergersub, Inc., Defendants.

Civil Action No. 2541–VCL.

Court of Chancery of Delaware.

Submitted: Dec. 10, 2009.
Decided: Dec. 22, 2009.

Michael D. Goldman, Esquire, Stephen C. Norman, Esquire, Brian C. Ralston, Esquire, Kirsten A. Zeberkiewicz, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Philip Le B. Douglas, Esquire, Mark R. Seiden, Esquire, Laura W. Sawyer, Esquire, Angie Young Kim, Esquire, Jones Day, New York, New York, Attorneys for Plaintiffs NACCO Industries, Inc., and HB–PS Holding Company, Inc., now known as Hamilton Beach, Inc.

Donald J. Detweiler, Esquire, Kelly A. Terrible, Esquire, Titania M. Parker, Esquire, Greenberg Traurig, LLP, Wilmington, Delaware; Holly R. Skolnick Esquire, Eliot Pedrosa, Esquire, Greenberg Traurig, LLP, Miami, Florida, Attorneys for Defendant Applica Incorporated.

David C. McBride, Esquire, Bruce L. Silverstein, Esquire, Martin S. Lessner, Esquire, Christian Douglas Wright, Esquire, Michele Sherretta Budicak, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Leslie Gordon Fagen, Esquire, Bruce Birenboim, Esquire, Joyce S. Huang, Esquire, David M. Cave, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, Attorneys for Defendants Harbert Management Corporation, HMC Investors, L.L.C., Harbinger Capital Partners Offshore Manager, L.L.C., Harbinger Capital Partners Master Fund I, Ltd., HMC—New York, Inc., Harbinger Capital Partners Special Situations GP, LLC, Harbinger Capital Partners Special Situations Fund, L.P., APN Holding Company, Inc., and APN Mergersub, Inc.

## OPINION

LASTER, Vice Chancellor.

In 2006, Applica Incorporated embarked on a sale process. Applica initially entered into a merger agreement with NACCO Industries, Inc. Later, Applica terminated its agreement with NACCO and agreed to be acquired by affiliates of Harbert Management Corporation. A bidding contest ensued, which NACCO lost. In this action, NACCO seeks damages and other unspecified relief arising out of its defeated acquisition attempt. NACCO has asserted claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), tortious interference with contract (Count III), fraud (Count IV), equitable fraud (Count

V), aiding and abetting a breach of fiduciary duty (Count VI), and civil conspiracy (Count VII). Applying Rule 12(b)(6)'s plaintiff-friendly standard, I deny the motion to dismiss Counts I, III, IV and VII. I dismiss Counts II, V, and VI.

## I. FACTUAL BACKGROUND

I assume the following facts to be true for purposes of the motion to dismiss. The facts are drawn solely from the allegations of the Second Amended Complaint (the "Complaint") and from publicly filed documents that it incorporates by reference.

### A. The Parties

Defendant Harbert Management Corporation is an investment manager that oversees a hedge fund complex. The Complaint names as defendants the Harbert-affiliated entities that were involved in the Applica transaction. Many of the funds operate under the "Harbinger" name, and I refer to the Harbert-affiliated defendants collectively as "Harbinger." The Complaint previously named as individual defendants three Harbinger principals, all of whom were dismissed for lack of personal jurisdiction.

Defendant Applica is a Florida corporation headquartered in Miramar, Florida. Applica markets, distributes, and sells small household appliances. Applica is now a portfolio company of Harbinger. Prior to being taken private by Harbinger, Applica's common stock traded on the New York Stock Exchange.

Plaintiff NACCO is a Delaware corporation with its principal place of business in Mayfield Heights, Ohio. NACCO is a holding company whose shares trade on the New York Stock Exchange. NACCO owns plaintiff HB–PS Holding Company, Inc. ("Hamilton Beach"), a Delaware corporation with its principal place of business in Glen Allen, Virginia. Hamilton Beach is a designer, marketer, and distributor of small electric household appliances and commercial products for restaurants, hotels, and bars.

### B. NACCO And Applica Enter Into A Merger Agreement.

In early 2005, NACCO approached Applica about a strategic transaction with Hamilton Beach. The parties signed a non-disclosure agreement, exchanged confidential information, and began discussions. Applica broke off talks, inviting NACCO to re-approach in early 2006.

Applica proved more receptive in 2006. In January, Applica's board authorized merger discussions with NACCO. On February 16, Applica and NACCO updated their non-disclosure agreement, and NACCO agreed to a standstill provision that limited its ability to act unilaterally to acquire Applica. When NACCO found itself in a bidding contest for Applica some seven months later, the consequences of agreeing to the standstill would prove critical, because NACCO ended up competing against Harbinger, which was not similarly restricted and had used its freedom and the cover of allegedly false Schedule 13 disclosures to accumulate a large block of Applica stock.

On February 28, 2006, Applica announced publicly that it was exploring strategic alternatives. In March, Applica began making outgoing calls to potential strategic partners.

On May 2, 2006, Applica's board of directors decided to pursue NACCO's merger proposal. During the week of May 24, Applica conducted due diligence on Hamilton Beach's operations. On June 6, NACCO sent Applica a draft merger agreement. On July 23, the parties executed a merger agreement (the "Hamilton Beach

Merger Agreement"). In the contemplated transaction, NACCO would spin off Hamilton Beach, which would acquire Applica in a stock-for-stock merger. Following the transaction, NACCO's stockholders would own 75% and Applica's stockholders 25% of the resulting entity. In advance of the spin-off, Hamilton Beach would pay a $110 million cash dividend to NACCO. The parties announced the Hamilton Beach Merger Agreement on July 24.

## C. Harbinger Enters The Fray.

On September 14, 2006, Harbinger announced a bid to acquire all of the Applica shares it did not yet own at $6.00 per share. Although Harbinger had been on the scene for some time, this announcement heralded a change in Harbinger's public role.

Harbinger began purchasing Applica stock on February 24, 2006, at the direction of Harbinger principal Phillip Falcone, who instructed one of Harbinger's brokers to "START ACCUMULATING [APPLICA] QUIETLY. SIZE." That same day, Harbinger purchased 191,350 shares. On the next trading day, February 27, Falcone told the same broker, "I CAN USE MORE [APPLICA] TODAY." Within two days, Harbinger acquired another 518,285 shares. On February 28, Applica announced publicly that it was exploring strategic alternatives.

NACCO alleges that Harbinger's propitious timing resulted from Applica's management tipping Harbinger advisor David Maura. At the time, Applica and NACCO were bound by a non-disclosure agreement, which barred Applica from disclosing to any third party that "discussions relating to a possible Transaction are taking place, or . . . any other facts with respect to such discussions." According to NACCO, this was the first in a series of actions taken by Applica management to aid Harbinger. NACCO alleges that Applica senior executives knew their jobs were at risk in a strategic deal with Hamilton Beach, which already had a management team, and that Applica's insiders therefore favored Harbinger as a financial buyer who was likely to retain them.

On March 13, 2006, Harbinger filed a Schedule 13G disclosing its ownership of 8.9% of Applica's outstanding common stock. Schedule 13G only can be used by filers who acquire shares strictly for investment purposes. In the filing, Harbinger certified that the shares "were not acquired and are not held for the purposes of or with the effect of changing or influencing the control of [Applica]" and were "not held in connection with or as a participant in any transaction having such purpose or effect."

NACCO contends that in reality, Harbinger planned to influence the outcome of Applica's process for exploring strategic alternatives. At least as early as March 31, 2006, Maura pitched Falcone on the idea of combining Applica with Salton, Inc., a competing small electronic appliance distributor. Falcone responded, "I like it. Take control of that and buy [Salton] and [Applica]." On April 4, Falcone reminded Maura to focus on the opportunity.

Harbinger filed an amended Schedule 13G on April 4, 2006, disclosing additional purchases of Applica stock. The Complaint alleges that Applica CFO Terry Polistina and Applica Chairman Harry Schulman assisted Harbinger in obtaining large blocks of stock and increasing its position.

On April 26, 2006, Maura advised Falcone that he had modeled Salton and Applica "as one company" and recommended that Harbinger "take our [Applica] position up to 30%." He continued: "I am hearing the bids are in the $4 + range—we

sont [sic] make much money buying additional shares at $3.5—$3.76—but we can use a bigger position to keep the bidders honest and if we see enough value in the [Applica]/[Salton] combo—we can bid for [Applica] outright ourselves." He noted it was "cheaper to build the position now—rather than in Jun [sic] when there is a $4 bid on the table." The next day, he wrote Falcone that "[t]he biggest risk to this strategy is if we buy Salton preferred and get out bid by a strategic for [Applica]."

By May 14, 2006, Harbinger had acquired 24.7% of Applica's outstanding shares. Harbinger filed a Schedule 13D disclosing its position and stating as follows:

> The Shares held by the Reporting Persons were acquired for, and are being held for, investment purposes only. The acquisitions of the Shares were made in the ordinary course of the Reporting Persons' business or investment activities, as the case may be.

> The Reporting Persons have no plan or proposal which relates to, or would result in, any of the actions enumerated in Item 4 of the instructions to Schedule 13D.

On May 22, Maura wrote to Falcone that he was expecting a merger announcement from Applica "in the next 2–3 weeks." At the time, NACCO was conducting due diligence on Applica. On June 6, after purchasing additional shares that brought its holdings up to 30.8% of the outstanding stock, Harbinger filed an amended Schedule 13D, in which it made the same disclosure.

Also in May 2006, Harbinger moved on Salton. According to the Complaint, by June 2, Harbinger had acquired $100 million of the company's preferred stock and established a position in excess of $100 million in its debt. On June 22, Maura e-mailed Falcone: "I think we pay cash for [Applica]—take it private—then bid [REDACTED] for Salton—then the world [would] be knocking on our door . . . and we can take the new company public in 24–36 months for a massive gain." Maura described for Falcone the proposed structure of the Hamilton Beach merger, which was not yet public. In e-mails on June 24, Maura and Falcone discussed the details of a Salton bid for Applica. Maura outlined his plan and wrote, "In the process we completely replace both boards with a new board of people we know and who get the joke." Also in June, Harbinger retained a financial advisor to evaluate gaining "full/complete control of Applica."

In the midst of these internal exchanges, on June 21, 2006, Harbinger filed another Schedule 13D, in which it disclosed that it had increased its position to 32% of Applica's outstanding shares. The Schedule 13D stated: "The Reporting Persons have acquired their Shares of the Issuer for investment." Harbinger thus dropped the word "only" from its disclosure. Harbinger added a disclosure that "[t]he Reporting Persons evaluate their investment in the Shares on a continual basis including, without limitation, for possible synergies with their other current investments." Harbinger "reserve[d] the right to be in contact with members of [Applica's] management, the members of [Applica's] Board of Directors, other significant shareholders and others regarding alternatives that [Applica] could employ to maximize shareholder value." NACCO alleges that these disclosures were false not only because Harbinger already planned to influence or control Applica, but also because Harbinger already had been in covert contact with members of Applica's management who were tipping Harbinger about the deal process and because Harbinger had zeroed in on and was pursuing the specific alternative of an Applica–Salton combination.

In July 2006, Maura advised Harbinger not to enter into a confidentiality agreement with Applica because Maura did not think Harbinger "would learn more than we already know." By declining to sign the confidentiality agreement, Harbinger also avoided the standstill restriction that bound NACCO. Later that month, Maura's information again proved to be excellent. On Friday, July 21, Maura knew that Applica "has a deal" and that "it will be announced shortly." That same day, the Applica board approved the Hamilton Beach Merger Agreement. On Monday, July 24, the deal was announced.

On the same day that the Hamilton Beach merger was announced, Applica management contacted Harbinger through intermediaries and signaled that an all-cash offer for Applica would likely be successful. Harbinger responded by moving forward with plans for a Salton–Applica combination. Two days after the announcement of the Hamilton Beach Merger Agreement, Maura told a former Salton board member that Harbinger and Salton were going to bid for Applica. That same day, the Salton board approved a bid to be financed by Harbinger. The Salton board resolved that Applica be contacted and notified of the bid. Harbinger and Salton agreed that if Applica did not respond positively, Salton would tell Applica's lawyers that it was a breach of fiduciary duty for Applica's directors not to consider the Salton/Applica deal. Harbinger and Salton agreed that if Applica remained unresponsive, they would try other means, including a tender offer. NACCO believes, consistent with these plans, that a Salton representative contacted Applica on July 26, 2006.

At the time these communications were taking place, Applica was bound by a no-shop provision in the Hamilton Beach Merger Agreement and was obligated to give NACCO prompt notice of "any inquiry or proposal relating to an [Applica] Competing Transaction." The term "[Applica] Competing Transaction" broadly included "any merger, consolidation, share exchange, business combination or other transaction or series of transactions involving [Applica] that is conditioned on the termination of this Agreement or could reasonably be expected to preclude or materially delay the completion of the Merger." Applica did not disclose to NACCO either the outgoing communication from Applica management or the incoming call from Salton.

Nor did Harbinger revise its Schedule 13D disclosures. Thus, during the time that it was increasing its position in Applica to a nearly 40% stake, establishing effective control over Salton, receiving an outgoing communication from Applica management, and causing Salton to make a competing proposal to Applica, Harbinger continued to maintain that it was holding Applica shares "for investment purposes."

But just as Harbinger and Salton put their plans into motion, they hit a snag. Harbinger learned that its acquisition of Applica shares had triggered the Florida Control Shares Act (the "Florida Act") and that under the statute, Harbinger lost the right to vote its shares. Harbinger naturally sought to remedy this issue. On July 31, 2006, Maura contacted a senior Applica officer, expressed dissatisfaction with the Hamilton Beach Merger Agreement, and asked whether Applica intended to apply the Florida Act to Harbinger. The Applica officer assured Maura that Applica did not intend to rely on the Florida Act and that Harbinger would be able to vote its shares. On August 2, Harbinger asked Applica to seek a shareholder vote that would restore Harbinger's voting rights under the Florida Act. When Applica ad-

vised NACCO of the request, Applica assured NACCO that Harbinger planned on voting for the Hamilton Beach Merger Agreement.

Harbinger continued to increase its position in Applica, and on August 3, August 8, and August 11, 2006, Harbinger filed additional Schedule 13D forms disclosing its increased holdings. In its August 3 filing, Harbinger disclosed Maura's July 31 call to the "Applica senior officer" but stated that it was the Applica officer who raised the Florida Act and Applica's plan not to invoke it against Harbinger. Harbinger did not disclose that one subject of the call was Harbinger's dissatisfaction with the Hamilton Beach deal.

On August 17, 2006, Harbinger filed another Schedule 13D disclosing that its position now amounted to 39.24% of Applica's outstanding stock. Harbinger attached as an exhibit to its Schedule 13D an August 14 demand for books and records in which Harbinger requested stockholder lists as of May 10 and August 4 and information about representations Applica made in the Hamilton Beach Merger Agreement relating to whether the Florida Act applied.

In all of its August 2006 Schedule 13D filings, Harbinger continued to state that it was holding its shares for investment purposes and not with any plan or intention to influence or control Applica. None of the filings disclosed the July communication by Applica management or the Salton response. None of the filings disclosed that in Maura's calls to Applica, he had expressed Harbinger's dissatisfaction with the Hamilton Beach Merger Agreement. NACCO asserts that in reliance on Harbinger's Schedule 13D filings, Applica's reassurances that Harbinger would support the deal, and Harbinger's lack of any prior deal jump attempts, NACCO believed that Harbinger would not make a competing bid or seek to influence the outcome of the merger vote.

On September 14, 2006, Harbinger topped the Hamilton Beach Merger by offering to acquire all of the outstanding shares of Applica that Harbinger did not already own for $6.00 per share. In conjunction with its bid, Harbinger filed a Schedule 13D/A amending the disclosure in its prior Schedule 13 forms. The amended disclosure stated that rather than acquiring its shares for "investment purposes," Harbinger "acquired [its] Shares of [Applica] in order to acquire control of [Applica]." NACCO points to this amendment as an admission by Harbinger that its prior statements of intent were false.

Approximately one month later, on October 19, 2006, Harbinger amended its statement of intent once more. Harbinger now stated that as of September 14, its investment intent had changed, and as of that point it "now propose[d] to acquir[e] all of [Applica's shares]."

### D. Applica Jilts NACCO For Harbinger.

The Hamilton Beach Merger Agreement contained a no-shop provision limiting Applica's ability to explore competing transactions. If Applica received an unsolicited bona fide written offer that the Applica board determined was reasonably likely to constitute a "Superior Proposal," as defined in the Hamilton Beach Merger Agreement, then Applica could provide information to and enter into discussions with the offeror. On September 14, 2006, Applica advised NACCO that it had received Harbinger's offer. On September 15, Applica informed NACCO that Harbinger's $6.00 per share cash bid was reasonably likely to constitute a "Superior Proposal," such that Applica was initiating discussions with Harbinger. On Septem-

ber 26, Applica informed NACCO that it had entered into a confidentiality agreement with Harbinger.

On October 10, 2006, Applica notified NACCO that it was terminating the Hamilton Beach Merger Agreement and would enter into a merger agreement with Harbinger. Under the Hamilton Beach Merger Agreement, Applica was permitted to terminate the agreement to accept a "Superior Proposal."

On October 11, 2006, NACCO disputed Applica's ability to terminate the Hamilton Beach Merger Agreement, asserting that Applica had breached the no-shop provision and failed to notify NACCO promptly of developments involving Harbinger. On October 12 and 13, Applica and NACCO each reiterated their positions. On October 17, NACCO asserted that it had been misled by Harbinger and the statements in Harbinger's Schedule 13 filings.

In an effort to cure any violation of the prompt notice provision, Applica did not take any further action until October 19, 2006. On that date, Applica again informed NACCO that the Hamilton Merger Agreement was terminated. Applica paid NACCO the $4 million termination fee and $2 million in expense reimbursement that the Hamilton Beach Merger Agreement called for in the event the agreement was validly terminated to accept a topping bid. Applica then entered into a merger agreement with Harbinger (the "Harbinger Merger Agreement").

On November 2, 2006, Applica filed a preliminary proxy statement to solicit proxies in favor of a merger with Harbinger (the "Harbinger Proxy Statement"). The "Background of the Merger" section contained disclosures markedly different from what Harbinger had disclosed in its Schedule 13D filings. For example, the Harbinger Proxy Statement disclosed that "[i]n mid-July, a representative of Har-

binger . . . contacted [Applica's] financial advisor concerning the exploration of a possible strategic transaction." None of Harbinger's Schedule 13D filings disclosed that contact. The Harbinger Proxy Statement also disclosed that when Maura called the Applica senior officer on July 31, Maura "expressed dissatisfaction with the terms of the NACCO merger." Harbinger's Schedule 13D's had not disclosed this but rather portrayed the call as concerning only whether Harbinger could vote its shares in light of the Florida Act. According to the Harbinger Proxy Statement, Harbinger's expressed its dissatisfaction sufficiently strongly for the Applica board to discuss it on August 2.

### E. NACCO Files Suit.

On November 13, 2006, NACCO filed this action against Applica and Harbinger seeking, among other things, a decree of specific performance enforcing the Hamilton Beach Merger Agreement and an order enjoining the Harbinger merger. NACCO sought expedited discovery and a trial, but was informed that the Court's calendar could not accommodate a full trial prior to the anticipated closing of the Harbinger merger. NACCO then moved for a preliminary injunction. After a preliminary exchange of documents, NACCO withdrew its injunction application on December 1.

Two weeks later, on December 18, 2006, NACCO filed an action in the United States District Court for the Northern District of Ohio seeking injunctive relief against the Harbinger merger based on allegedly false statements in Harbinger's Section 13 filings and in the Harbinger Proxy Statement. On December 20, the district court denied NACCO's applications for a temporary restraining order, preliminary injunction, and expedited discovery. The district court held that on the prelimi-

nary record before it, NACCO had failed to present a sufficiently strong likelihood of success on the merits. In a passage understandably embraced by the defendants, the district court noted, "[c]ontrary to Plaintiffs' position, the Court does not perceive any falsity in Harbinger's filings when they are properly viewed alongside unfolding events." *NACCO Indus., Inc. v. Applica, Inc.*, 2006 WL 3762090, at *7 (N.D.Ohio Dec.20, 2006). On January 10, 2007, NACCO dismissed this federal action without prejudice.

### F. A Bidding Contest Ensues.

Between December 15, 2006, and January 17, 2007, NACCO and Harbinger bid against each other for Applica. On December 15, NACCO launched a tender offer for Applica at $6.50 per share. Harbinger matched. On December 21, NACCO raised its bid to $7.00. Harbinger matched. Incremental bidding continued, with NACCO ultimately offering $8.05 per share on January 16, 2007.

On January 17, 2007, Harbinger raised its bid to $8.25 per share. In consideration for the increased bid, Applica nearly doubled Harbinger's termination fee— from $4 million to $7 million—and increased Harbinger's expense reimbursement from $2 million to $3.3 million.

NACCO points out that throughout the bidding, Harbinger had the benefit of owning a nearly 40% block that it had acquired for much lower prices at a time when NACCO was limited by a standstill agreement. Harbinger thus effectively was bidding for 60% of Applica, while NACCO was bidding for the whole thing. Put differently, every time NACCO put a dollar on the table, Harbinger could match with 60 cents. NACCO claims Harbinger only enjoyed this advantage because of its fraudulent Section 13 disclosures.

On January 24, 2007, Applica's stockholders approved the Harbinger Merger Agreement. NACCO terminated its offer.

### G. Harbinger Causes Applica To Merge With Salton.

Shortly after Applica's stockholders approved the Harbinger merger, Applica and Salton entered into a merger agreement. Harbinger was the driving force behind the deal. On December 28, 2007, the Salton–Applica transaction closed. Harbinger owned 92% of the combined company.

### H. This Action Continues.

After the bidding contest ended, this action resumed. In October 2007, NACCO amended its complaint. The individual defendants disputed whether they were subject to personal jurisdiction, and NACCO sought jurisdictional discovery. In February 2008, NACCO moved to file a second amended complaint. Notwithstanding the liberal standard for amendment under Rule 15(a), the defendants opposed that motion. Vice Chancellor Lamb granted plaintiffs leave to amend in a letter opinion dated May 7, 2008.

Meanwhile, the individual defendants were opposing NACCO's efforts to conduct jurisdictional discovery, and NACCO was forced to move to compel. During argument after full briefing, Vice Chancellor Lamb assisted the parties in working out a stipulation that could be used in lieu of jurisdictional discovery. That stipulation was finally entered in December 2008.

It then came time for the defendants to brief their motions to dismiss the second amended complaint. The motions were argued in May 2008. Vice Chancellor Lamb ruled that this Court could not exercise personal jurisdiction over the individual defendants, who were dismissed from the case.

As I discuss below, NACCO's fraud claim rests on statements in federal securities filings mandated by the Securities Exchange Act of 1934 (the "Exchange Act"). In their briefing, the parties did not meaningfully discuss whether the Exchange Act's grant of exclusive jurisdiction to the federal courts prevented this Court from entertaining NACCO's fraud claim. As a court of limited jurisdiction, this Court has an independent obligation to inquire into the basis for invoking its powers. Vice Chancellor Lamb raised the issue during argument on the motion to dismiss, and the parties undertook to provide supplemental briefing.

## II. LEGAL ANALYSIS

A Rule 12(b)(6) motion will be denied "unless it appears with reasonable certainty that the plaintiff would not be entitled to relief under any reasonable set of facts" supported by the complaint. *Bonham v. HBW Holdings, Inc.*, 2005 WL 3589419, at *6 (Del.Ch. Dec.23, 2005). Applying this plaintiff-friendly standard, I deny the motion to dismiss Counts I, III, IV and VII. I dismiss Counts II, V, and VI.

### A. Count I States A Claim For Breach Of Contract.

The Hamilton Beach Merger Agreement became effective as of July 23, 2006. From that point on, Applica was bound by Section 6.12 of the agreement, entitled "No Solicitation." Count I of the Complaint asserts that Applica breached Section 6.12.

I find it helpful to break Section 6.12 into subparts. Under Sections 6.12(a) and (b), Applica had the obligation to stop all discussions about any competing transaction. Framed in customary language, these sections stated:

(a) [Applica] will immediately cease, terminate and discontinue any discussions or negotiations with any Person conduct-ed before the date of this Agreement with respect to any [Applica] Competing Transaction. . . .

(b) Prior to the Effective Time, [Applica] will not, and will cause its Affiliates and representatives not to, directly or indirectly solicit, initiate or encourage any inquiries or proposals from, discuss or negotiate with, or provide any non-public information to, any Person (other than [NACCO], [Hamilton Beach] and their respective representatives) relating to any merger, consolidation, share exchange, business combination or other transaction or series of transactions involving [Applica] that is conditioned on the termination of this Agreement or could reasonably be expected to preclude or materially delay the completion of the Merger (an "*[Applica] Competing Transaction* ").

I will refer to these subsections as the "No–Shop Clause."

Section 6.12(d) created an exception to the No–Shop Clause. In similarly customary language, Section 6.12(d) permitted Applica "to engage in any discussions or negotiations with, or provide any information to, any Person" if Applica "received an unsolicited bona fide written offer regarding an [Applica] Competing Transaction from a third party (which has not been withdrawn) and its board of directors has determined in good faith that there is a reasonable likelihood that such [Applica] Competing Transaction would constitute [an Applica] Superior Proposal." Section 6.12(e) defined "Applica Superior Proposal" as, in substance, an Applica Competing Transaction "which the board of directors of [Applica] concludes, after consultation with its financial advisors and following the receipt of the advice of its outside counsel, would, if consummated, result in a transaction that is more favorable to the [Applica] Shareholders than the Transactions." I

will refer to this aspect of Section 6.12(d) as the "Superior Proposal Clause."

In addition to the No–Shop and Superior Proposal Clauses, Sections 6.12(c) and (d) required Applica to keep NACCO informed of any inquiry or proposal relating to an Applica Competing Transaction. Section 6.12(c) provided:

[Applica] will promptly (and in any event within 24 hours) notify [NACCO] of its or any of its officers', directors' or representatives' receipt of any inquiry or proposal relating to, an [Applica] Competing Transaction, including the identity of the Person submitting such inquiry or proposal and the terms thereof.

In language following the Superior Proposal Clause, Section 6.12(d) provided that "[Applica] will use its commercially reasonable efforts to keep [NACCO] informed promptly of the status and terms of any such proposal or offer and the status and terms of any such discussions or negotiations and will promptly provide [NACCO] with any such written proposal or offer." I will refer to these aspects of Section 6.12 as the "Prompt Notice Clause."

## 1. The Period From July 23 Until September 14, 2006.

█ In asserting its breach of contract claim, NACCO first focuses on the period of time from July 23, 2006, when the Hamilton Beach Merger Agreement became effective, until September 14, when Applica advised NACCO that it had received Harbinger's $6.00 per share proposal. I find that the Complaint contains allegations sufficient to support a claim for breach of the Hamilton Beach Merger Agreement during this period under the plaintiff-friendly Rule 12(b)(6) standard.

The Complaint alleges that "[o]n July 24, 2006, the morning after the stock-for-stock Hamilton Beach Merger Agreement was signed, Applica caused Harbinger to be informed that Harbinger would likely succeed with an all-cash offer for Applica." The Complaint thus alleges that an indirect, outgoing call was made by Applica management in violation of the No–Shop Clause.

The Complaint further alleges that on July 26, 2006, a Salton representative contacted Applica about a Salton–Applica transaction. Although the Complaint makes this allegation upon information and belief, it supports the allegation with specific facts that make it reasonable to infer that the communication occurred. The Salton call responded to the outgoing solicitation by Applica management. The same day it was made, Harbinger advisor Maura told a former Salton board member that Harbinger and Salton were making a competing bid for Applica. That same day, the Salton board of directors "approved a Salton bid, financed by Harbinger, to acquire Applica" and "directed that Applica be informed that Salton was making a bid for Applica." Harbinger and Salton agreed that if Applica did not respond positively, "Salton would inform Applica's lawyers that Applica was in breach of its fiduciary duties." The Harbinger Proxy Statement disclosed that "[i]n mid-July, a representative of Harbinger . . . contacted [Applica's] financial advisor concerning the exploration of a possible strategic transaction." I find it reasonable to infer at the pleading stage that a Salton contact took place. The Complaint alleges that, in violation of the Prompt Notice Clause, Applica never disclosed the Salton contact to NACCO.

The Complaint then alleges additional communications between Harbinger and Applica. It alleges that on July 31, 2006, a Harbinger representative "contacted a senior Applica officer and expressed dissatisfaction with the Hamilton Beach Merger Agreement." During the conver-

sation, the Harbinger and Applica representatives discussed whether Applica would take the position that Harbinger had triggered the Florida Act, thereby limiting Harbinger's ability to vote on the Hamilton Beach Merger Agreement. The Complaint alleges that the Applica representative "assured [the Harbinger representative] that Applica did not intend to apply the Florida Act to Harbinger." The Complaint alleges that by September, it was "common knowledge at Applica that Harbinger intended to seek control of Applica." The Complaint also alleges that at least one Applica employee advised an outsider not to sell his Applica shares because "Harbinger has something up the sleeve."

These allegations are sufficient to plead a claim for breach of the No–Shop and Prompt Notice Clauses. In reaching this conclusion, I focus on the breadth of both clauses and the related definition of Applica Competing Transaction. The No–Shop Clause barred Applica from taking any action to "directly or indirectly solicit, initiate or encourage any inquiries or proposals from, discuss or negotiate with, or provide any non-public information to, any Person (other than [NACCO], [Hamilton Beach] and their respective representatives)" regarding an Applica Competing Transaction. It was thus not limited to soliciting a competing bid (which the Complaint sufficiently alleges took place), but also extended to engaging in discussions or negotiations relating to an Applica Competing Transaction. The Prompt Notice Provision likewise was not limited to a competing bid or firm offer, but extended to any "inquiry or proposal" relating to an Applica Competing Transaction. The definition of "Applica Competing Transaction" encompassed "any merger, consolidation, share exchange, business combination or other transaction or series of transactions involving [Applica] that is [1] conditioned on the termination of this Agreement *or*

[2] could reasonably be expected to preclude or materially delay the completion of the Merger." Hamilton Beach Merger Agreement § 6.12(b) (emphasis added). The second half of this definition thus encompassed any "transaction or series of transactions that … could reasonably be expected to preclude or materially delay the completion of the Merger."

The No–Shop Clause and Prompt Notice Provision thus covered the outgoing communication by Applica management and the incoming call from Salton. They also covered the discussions regarding Harbinger's dissatisfaction with the Hamilton Beach Merger Agreement and its request for a waiver of the vote-stripping effect of the Florida Act, which related to a "transaction or series of transactions that … could reasonably be expected to preclude or materially delay the completion of the Merger."

In denying the motion to dismiss Count I with respect to this period, I am also influenced by the Complaint as a whole, which alleges that throughout the deal timeline, Harbinger representatives received timely and accurate tips and assistance from Applica insiders. Just four days before Applica announced publicly that it was exploring strategic alternatives, Falcone gave the order to "START ACCUMULATING [APPLICA] QUIETLY. SIZE." In May, when NACCO was conducting due diligence, Harbinger knew to expect a merger announcement "in the next 2–3 weeks." In June 2006, Harbinger already knew the structure of the proposed Hamilton Beach merger. In July, Harbinger decided not to enter into a confidentiality agreement with Applica because the Harbinger representatives did not believe they "would learn more than we already know." On Friday, July 21, the same day the Applica board approved the Hamilton Beach Merger Agreement,

Harbinger knew that Applica "has a deal" and that "it will be announced shortly." The deal was announced on Monday, July 24.

Although these communications pre-dated the execution of the Hamilton Beach Merger Agreement and thus do not give rise in themselves to any claim for breach, they support the inferences that NACCO asks me to draw about the relationship between Applica insiders and Harbinger and the communications that occurred. As the Complaint alleges, Applica's senior management feared they would lose their jobs following a strategic deal with Hamilton Beach, and they favored Harbinger as a financial buyer that needed a management team. The pre-merger agreement communications involved highly confidential information and took place at a time when the NACCO–Applica non-disclosure agreement prevented precisely those types of communications. These allegations support a pleading stage inference of a pattern of contacts between Applica insiders and Harbinger representatives that continued after the execution of the Hamilton Beach Merger Agreement and in violation of its terms.

I recognize that each of the allegations in the Complaint, when viewed separately and in isolation, can be minimized. I also recognize that there are potentially legitimate explanations for each of the communications and for Applica's and Harbinger's conduct. My task at the pleadings stage, however, is not to weigh competing inferences but rather to draw reasonable inferences in favor of the plaintiff.

2. **The Period From September 14 Until October 10, 2006.**

█ As a second basis for its breach of contract claim, NACCO focuses on the time period starting on September 14, 2006, when Applica advised NACCO that it had received Harbinger's $6.00 per share proposal. On that date, Applica exercised its right under the Superior Proposal Clause to enter into discussions with Harbinger. NACCO alleges that from that point on, NACCO breached its obligations under the Prompt Notice Clause to "use its commercially reasonable efforts to keep [NACCO] informed promptly of the status and terms of [Harbinger's proposal] and the status and terms of any such discussions or negotiations."

According to the Complaint, the sum total of Applica's communications to NACCO during this period consisted of: (i) informing NACCO on September 14, 2006, of Harbinger's competing proposal, which Harbinger announced publicly; (ii) advising NACCO on September 22 that Applica had entered into a confidentiality agreement with Harbinger, which also was publicly disclosed; and (iii) notifying NACCO on October 10 that Applica was terminating the Hamilton Beach Merger Agreement. Applica claims it was not "commercially reasonable" to disclose anything else about the Harbinger discussions. In other words, according to Applica, NACCO bargained for nothing more than the right to receive the same information that Applica made publicly available to its stockholders. For purposes of its motion to dismiss, Applica argues that this level of notice was commercially reasonable as a matter of law.

I disagree and conclude that the Complaint states a claim for breach of the Prompt Notice Clause during the twenty-seven day period from September 14 until October 10, 2006. According to the Complaint, Applica made no effort to keep NACCO informed about the status of its discussions. Applica said nothing to NACCO about its negotiation of a confidentiality agreement with Harbinger beginning on September 14 and extending "over the

next few days." It was not until after the close of business on September 21 that NACCO heard from Applica, and then only to be told that a confidentiality agreement had been signed. This fact was in any event disclosed in an SEC filing.

Between September 22 and September 27, 2006, NACCO heard nothing more from Applica regarding the competing Harbinger proposal. The Complaint alleges that on September 27, in response to NACCO's request for information, Applica informed NACCO that "Harbinger had not even contacted Applica regarding any due diligence materials."

Between September 27 and October 10, 2006, Applica again went silent. On Friday, October 6, consistent with its belief that Harbinger would not make a binding competing offer, NACCO asked Applica for input regarding the SEC's comments on the September 12 preliminary Form S–4 for the Hamilton Beach transaction. Applica told NACCO that its Form S–4 information "would be forthcoming." Then on October 10, Applica notified NACCO of its board's October 9 decision to proceed with the "fully negotiated" Harbinger transaction.

These allegations readily support a claim that Applica did not act in a commercially reasonable fashion by effectively going radio silent between September 14 and October 10, 2006. Applica had an affirmative obligation to use commercially reasonable efforts to keep NACCO informed about the "status" of the discussions or negotiations. NACCO could reasonably expect Applica to have regularly picked up the phone. Merger and acquisition activity typically proceeds at an expedited pace. Particularly in the context of a topping bid, days matter. At the pleading stage, I have no difficulty inferring that Applica breached the Hamilton Beach Merger Agreement by dragging its feet (at best) in

providing information to NACCO and offering up only minimal and parsimonious disclosures that it was making publicly in any event.

The generally reasonable inference that Applica and Harbinger delayed the flow of information to NACCO has specific support. On Wednesday, October 4, 2006, Falcone received an e-mail from Maura, Harbinger's representative in the Applica negotiations, in which Maura reported on his October 3 discussion with Applica's CFO. According to the e-mail, a week before NACCO was informed of the Harbinger negotiations, Harbinger instructed Applica to "deny NACCO the weekend over which to think about" a matching bid. Even though Maura conceded that this would provide NACCO a "[v]ery short fuse," he wrote that "I like this strategy." The Maura e-mail fits with an overall pattern in which Applica and Harbinger worked together to gain an advantage over NACCO that was inconsistent with NACCO's rights under the Hamilton Beach Merger Agreement.

Although the allegations I have described are sufficient to state a claim, the Complaint goes further and alleges that in response to NACCO's efforts to exercise its rights under the Prompt Notice Clause, Applica went so far as to provide false information to NACCO. The pleading alleges that on September 27, 2006, in response to a NACCO inquiry about the status of discussions with Harbinger, Applica told NACCO that "Harbinger had not even contacted Applica regarding any due diligence materials." Yet according to the Harbinger Proxy Statement, Harbinger had been engaged in "detailed" due diligence by that point for almost a week. And again on October 6, in response to NACCO's request for Applica's input on the preliminary Form S–4, Applica informed NACCO that its comments "would

be forthcoming." The Harbinger Proxy Statement reveals that by that time, Applica had received a draft of the Harbinger Merger Agreement, Applica had negotiated its terms, and Applica's board was scheduled to meet to approve it. What was ultimately "forthcoming" was Applica's notice purportedly terminating the Hamilton Beach Merger Agreement in favor of a "fully negotiated" transaction with Harbinger. The Prompt Notice Clause certainly does not contemplate that Applica would provide false information to NACCO.

### 3. The Complaint Adequately Pleads Damages.

■ Defendants argue aggressively that despite having pled breaches of the Hamilton Beach Merger Agreement, NACCO has not sufficiently pled damages and thus its contract claims should be dismissed. The crux of the "no damages" argument is that NACCO subsequently engaged in a bidding war for Applica and lost. Having been defeated in the marketplace, the defendants claim that NACCO should not have a remedy in court.

If embraced as grounds for a pleadings-stage dismissal, the defendants' theory would have serious and adverse ramifications for merger and acquisitions practice and for our capital markets. Parties bargain for provisions in acquisition agreements because those provisions mean something. Bidders in particular secure rights under acquisition agreements to protect themselves against being used as a stalking horse and as consideration for making target-specific investments of time and resources in particular acquisitions. Target entities secure important rights as well. It is critical to our law that those bargained-for rights be enforced, both through equitable remedies such as injunctive relief and specific performance, and, in the appropriate case, through monetary remedies including awards of damages.

I am comfortable inferring at the pleading stage that if NACCO succeeds in establishing a breach of the Hamilton Beach Merger Agreement, it will be able to establish harm sufficient to invoke this Court's remedial powers. NACCO is entitled to make its case that it should receive its full expectancy damages for breach of the Hamilton Beach Merger Agreement. If it cannot obtain expectancy damages, then NACCO is entitled to prove an alternative damages measure, such as its reliance interest.

In terms of any reliance-based recovery, NACCO will have to contend with its receipt of a bargained-for $4 million termination fee and $2 million in expense reimbursement. But as is customary in merger agreements, Applica's right to terminate the Hamilton Beach Merger Agreement under Section 8.1(h) and pay the fees without further liability depended on Applica complying with its obligations under Section 6.12, including the No–Shop and Prompt Notice Clauses. And Section 8.2 of the Hamilton Beach Merger Agreement excludes from the limitation on liability any termination resulting "from the willful and material breach by a party of any of its representations, warranties or covenants in this Agreement." It is far from clear at this stage that NACCO is bound contractually or factually to the termination fee and expense reimbursement as a measure of recovery.

Without question, the damages inquiry will present difficult legal and factual issues. But it is premature to address those now or to expect NACCO to have quantified its damages claims at the pleading stage. It is certainly a reasonable inference that NACCO has been damaged.

For all these reasons, I conclude that Count I pleads a claim for breach of Hamilton Beach Merger Agreement.

## B. Count II Fails To State A Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

In Count II, NACCO asserts a claim for breach of the implied covenant of good faith and fair dealing. Although part of every contract governed by Delaware law, the implied covenant does not apply when "the subject at issue is expressly covered by the contract." *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del.Ch.1992). The Hamilton Beach Merger Agreement is a detailed contract containing specific provisions governing the issues that NACCO has raised. The express terms of the Hamilton Beach Merger Agreement, including the No–Shop Clause and the Prompt Notice Clause, establish the scope of NACCO's rights. These specific provisions, bargained for and crafted by sophisticated parties, leave no room for the implied covenant. Count II is dismissed.

## C. Count IV States A Claim For Fraud.

I now jump to Count IV, in which NACCO asserts a claim for common law fraud against Harbinger. I do so because my analysis of Count IV influences my ruling on Count III, which asserts a claim for tortious interference with contract. I conclude that I have jurisdiction to consider NACCO's fraud claim and that a claim has been adequately pled.

### 1. Jurisdiction

The fraud claim turns exclusively on statements that Harbinger made in its Section 13 filings between March 8 and August 17, 2006. The source of Harbinger's statements raises the jurisdictional issue of whether a Delaware court can provide a common law fraud remedy for false statements in an Exchange Act filing. The Delaware Supreme Court has held that such a remedy exists. Moreover, the ability of this Court to enforce such a remedy where a Delaware entity has been accused of fraud serves important Delaware interests.

The jurisdictional provisions of the Exchange Act provide the initial structure for the analysis. Section 27 of the Exchange Act provides: "The district courts of the United States ... shall have exclusive jurisdiction of violations of [the Exchange Act] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder." 15 U.S.C. § 78aa. At the same time, Section 28(a) of the Exchange Act provides that "[T]he rights and remedies provided by [the Exchange Act] shall be in addition to any and all other rights and remedies that may exist at law or in equity...." 15 U.S.C. § 78bb.

The Delaware Supreme Court analyzed the implications of Sections 27 and 28 of the Exchange Act for state law claims in *Rossdeutscher v. Viacom, Inc.*, 768 A.2d 8 (Del.2001). The plaintiffs in that case sued on behalf of a class of holders of contingent value rights ("CVRs") whose value depended upon the price of the common stock of Viacom, Inc. The plaintiffs alleged that during the valuation period for the CVRs, Viacom made false statements regarding its financial condition to artificially inflate its stock price, resulting in a lower payout on the CVRs. More than one year after discovery of the violations, the plaintiffs sued for breach of contract, asserting that Viacom's conduct violated the implied covenant of good faith and fair dealing in

the CVR agreements. The Delaware Superior Court dismissed the claims, holding that the contract claims were federal securities claims in disguise, and, under the federal securities laws, the claims had to be filed within one year after discovery of the violations. *See id.* at 10–16.

The Delaware Supreme Court reversed. Citing Section 28 of the Exchange Act, the Supreme Court held that "the federal statutory remedies of the Act over which the federal courts have exclusive jurisdiction are intended to coexist with claims based on state law and not preempt them." *Id.* at 17 (footnote omitted). The Delaware Supreme Court noted that the language of Section 28 was "not limited to state securities statutes or common law fraud actions" and therefore implied that "the express intention of Congress was that the federal securities law would not dilute any remedies allowed by the states, either in law or equity." *Id.* Citing securities laws treatises, the Delaware Supreme Court observed that commentators consistently regarded state common law fraud claims as existing in parallel with the anti-fraud provisions of the Exchange Act. *Id.* at 18. Based on these authorities, the Delaware Supreme Court held that a common law claim for breach of the implied covenant of good faith and fair dealing similarly could proceed independent of the Exchange Act. *Id.* The Delaware Supreme Court therefore reversed the Delaware Superior Court's ruling that the federal statute of limitations applied and remanded the case to proceed on the state law theory.

 Although it might be possible to construe *Rossdeutscher* narrowly as addressing the statute of limitations for a breach of contract claim, a responsible reading of *Rossdeutscher* must recognize the intellectual foundation of the decision. The Delaware Supreme Court started from the premise that a claim for common law fraud based on false statements in federal securities filings could be litigated independently in state court. The Delaware Supreme Court then expanded that basic rule to include a common law claim for breach of the implied covenant of good faith and fair dealing. I therefore view *Rossdeutscher* as controlling on the question of whether a state law claim for common law fraud can proceed in this court, even though the statements giving rise to the claim appeared in filings made pursuant to the Exchange Act. Under *Rossdeutscher*, it can. *Accord Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 468 (Del.1992) (affirming post-trial judgment for plaintiff on common law fraud claim based on false statements in Exchange Act filings but reversing class certification because of individualized reliance inquiry); *see Malone v. Brincat*, 722 A.2d 5, 9 (Del.1998) (holding that "directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty" and that state court forum for false disclosures in Exchange Act filings was not foreclosed by the exclusive jurisdiction provisions of the federal securities laws).

 The Delaware Supreme Court's analysis in *Rossdeutscher* comports with federal decisions addressing the removal of state law claims to the federal court. Generally speaking, a basis for removal exists "only [in] those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 27–28, 103 S.Ct. 2841, 77 L.Ed.2d 420, (1983). There must be more than simply a need to consider federal law. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313,

125 S.Ct. 2363, 162 L.Ed.2d 257 (2005); Merrell Dow Pharms. Inc. v. Thompson, 478 U.S. 804, 814, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). "[T]he question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Grable, 545 U.S. at 314, 125 S.Ct. 2363.

The resulting class of removable cases is a "special and small category." Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 699, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006). Importantly, a reference to federal statute or regulations in a state court pleading is not sufficient to support federal court jurisdiction. As the United States Supreme Court noted in Grable, "[t]he violation of federal statutes and regulations is commonly given negligence per se effect in state tort proceedings." 545 U.S. at 318, 125 S.Ct. 2363. The Grable Court reaffirmed its prior holding in Merrell Dow, which had rejected the idea that federal question jurisdiction would exist "solely because the violation of the federal statute is said to [create] a rebuttable presumption [of negligence] . . . under state law." Grable, 545 U.S. at 319, 125 S.Ct. 2363 (quoting Merrell Dow, 478 U.S. at 811–12, 106 S.Ct. 3229) (brackets and ellipses in original). Federal statutes and regulations therefore can be used as a "guidepost" for evaluating conduct for purposes of state law claims without giving rise to a substantial, disputed question of federal law sufficient to support removal. New York v. Justin, 237 F.Supp.2d 368, 374 (W.D.N.Y.2002).

In the specific context of the Exchange Act, removal jurisdiction has been held to exist where the state law claim necessarily turned on the meaning of federal securities regulations. For example, in Sparta Surgical Corporation v. National Association of Securities Dealers, Inc., 159 F.3d 1209 (9th Cir.1998), an issuer sued the National Association of Securities Dealers ("NASD") and the Nasdaq Stock Market after its stock was delisted from the NASDAQ SmallCap market. The suit was filed in California state court and asserted state law claims for breach of contract, negligence, fraud, and tortious interference with economic relations. Id. at 1211. The essence of the issuer's claim was that the NASD acted "in direct violation of its own rules and procedures" when it delisted the stock. The defendants sought to remove the claim to federal court under Section 27 of the Exchange Act. The Ninth Circuit observed that the NASD's rules "were issued pursuant to the Exchange Act's directive that self-regulatory organizations adopt rules and by-laws in conformance with the Exchange Act," and the Exchange Act required issuers to comply with both the Exchange Act and NASD's rules. Id. at 1212. The critical fact for removal was that under the plaintiffs' theory of the case, the issuer had no state law claim unless the NASD violated its own rules. As a result, the case not only implicated but necessarily turned upon the federal regulations. Removal was therefore upheld. Id. at 1213.

Removal also was upheld in D'Alessio v. New York Stock Exchange, Inc., 258 F.3d 93 (2d Cir.2001), an action brought by a broker who was discharged for violating New York Stock Exchange regulations adopted pursuant to the Exchange Act that limited his ability to trade for his own benefit. The broker alleged that his termination was wrongful, asserted various tort claims, and also asserted a breach of contract claim, all based on his contention that senior NYSE officials "conspired to violate applicable statutory and regulatory

prohibitions governing unlawful trading ... by 'concoct[ing] a phoney interpretation' of these provisions and knowingly disseminating that incorrect interpretation" to the broker's detriment. *Id.* at 97 (brackets in original). The broker's state law claims thus depended entirely on the NYSE's interpretation having been "concoct[ed]." As in *Sparta Surgical*, the alleged violation of the Exchange Act and NYSE regulations was essential to the state law claim.

In contrast to *Sparta Surgical* and *D'Alessio*, where a plaintiff has sought to assert a common law fraud or misrepresentation claim, the fact that the claim might have given rise to a similar claim under the federal securities laws generally has not supported removal jurisdiction. For example in *Sung ex rel. Lazard Ltd. v. Wasserstein*, 415 F.Supp.2d 393 (S.D.N.Y. 2006), the plaintiff alleged that the defendants schemed with various hedge funds to pump up the price of an initial public offering, including through "the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings." *Id.* at 395. The plaintiffs asserted only state law claims. The district court thoroughly reviewed the law of removal jurisdiction, examined the complaint, and held that its references to federal law and federal filings were part of the factual predicate for state law claims.

> To be sure, Sung's claims arise in significant part from allegedly false and misleading statements made on a prospectus, a document that is required by federal securities regulations. However, that the statements were made in a federally required document does not change the inquiry whether, standing alone, they were false and misleading as a necessary element of a cause of action under state law.

*Id.* at 406. The district court granted the petition to remand.

The district court employed similar reasoning in *Finance and Trading, Ltd. v. Rhodia S.A.*, 2004 WL 2754862 (S.D.N.Y. Nov.30, 2004). The plaintiffs asserted claims for common law fraud and negligent misrepresentation based, in part, on statements made in a prospectus filed with the SEC. The district court remanded the case, finding that "[t]here is no substantial federal question necessarily presented in either of plaintiffs' claims in this case." *Id.* at *6. The district court held that:

> Plaintiffs' claims may be assessed entirely by applying New York's common law standards to the facts in this case. Although certain of defendants' alleged misrepresentations certainly were contained in prospectuses filed with the SEC, plaintiffs' claims do not depend on any rights or causes of action created by federal law. They stand independently on their state common law grounds.

> Plaintiffs did have the option of bringing an action under Section 10(b) of the Exchange Act.... Plaintiffs also could have filed a claim based upon Section 11 of the Securities Act of 1933.... That these statutes provide remedies, however, does not mean that plaintiffs were obligated to base their claims upon them. No federal interest is compromised by the availability of a parallel state-law action, as federal securities laws generally do not preempt similar state law causes of action. The plaintiff is the master of the complaint, and may choose to proceed under state law alone unless the complaint alleges charges necessitating the construction of federal law.

*Id.* at *7 (citations omitted). Many deci-

sions reach similar conclusions.[1]

I recognize that there are federal decisions that have placed greater importance on references to the federal securities laws in state law complaints and permitted removal where the complaint specifically pled violations of the Exchange Act and SEC rules or cited the federal statute and regulations as a basis for the state law claims. *See, e.g., Landers v. Morgan Asset Mgmt., Inc.*, 2009 WL 962689, at *7–8 (W.D.Tenn. Mar.31, 2009); *Gobble v. Hellman*, 2002 WL 34430286, at *3 (N.D.Ohio Mar.26, 2002). This appears to be the minority approach and stands in tension with the United States Supreme Court's clarification of removal jurisdiction in *Empire* and *Grable*. It also demonstrates, as the *Grable* decision recognized, that the extent to which a state law claim necessarily raises a federal issue is inherently a question of degree, requiring a pragmatic judgment based on the particulars of the individual case.

The removal decisions show, consistent with *Rossdeutscher*, that Section 27 of the Exchange Act does not confer exclusive jurisdiction on the federal courts to hear common law fraud claims based on statements in federal securities filings. Additional support for this conclusion lies in the numerous federal decisions in which plaintiffs have asserted both securities fraud under Rule 10b–5 or another federal provision *and* common law claims for fraud and misrepresentation. Those decisions consistently exercise federal jurisdiction over the state law claims under a theory of supplemental jurisdiction under 28 U.S.C. § 1367 (or its predecessors pendent and ancillary jurisdiction), not federal question jurisdiction under 28 U.S.C. § 1331, nor exclusive Exchange Act jurisdiction under Section 27. In just one illustration of this widespread approach, a target corporation sought injunctive relief against a bidder for making false statements in various federal securities filings, including Schedule

---

1. *See Emulex Corp. v. Broadcom Corp.*, 2009 WL 1872694, *3 (C.D.Cal. June 29, 2009) (remanding target corporation's state law claims for fraud, unfair competition, and tortious interference that were based on statements in acquirer's securities' filings). "None of these allegations assert rights created by the Williams Act ... and interpretation of the Williams Act is not needed to determine whether these allegations, if true, constitute fraud under California law." *Id. See also Batchelor v. Deloitte & Touche, LLP*, 2009 WL 1255449, at *4 (S.D.Fla. Apr.27, 2009) (remanding state law claim for fraud against auditor that cited auditor disclosure requirements under federal Regulation S–K); *Firefighters' Ret. Sys. v. Regions Bank*, 598 F.Supp.2d 785, 796 (M.D.La.2008) (remanding claims for misrepresentation and other state law theories that "can largely be resolved by reference to Louisiana's securities law and to other state laws cited in [the] petition, with limited consultation of federal securities law"); *Welch v. Oak Grove Land Co.*, 2008 WL 3874549, at *5–7 (S.D.Miss. Aug.14, 2008) (remanding state law claims, including for intentional and negligent misrepresentation, even though some of challenged statements appeared in public disclosure documents); *Ekas v. Burris*, 2007 WL 4055630, at *4 (S.D.Fla. Nov.14, 2007) (remanding state law claims for breach of fiduciary duty despite quotations from and the assertion of a breach of Section 13 of the Exchange Act and finding that "[t]hese passing references to federal law are not essential to proving any of the elements of the state causes of action"); *Collins v. Pontikes*, 447 F.Supp.2d 895, 901 & n. 2 (N.D.Ill.2006) (remanding state law claims, including claims for common law fraud, that could alternatively have been pled under Rule 10b–5); *Lippitt v. Raymond James Fin. Srvcs., Inc.*, 340 F.3d 1033, 1043 (9th Cir.2003) (holding that suit against NYSE-registered brokers challenging sales practices involving callable certificates of deposit under California Unfair Competition Act did not did not depend on the business practice being unlawful under the NYSE rules but rather on whether the practices were "deceptive, untrue or misleading" regardless of whether or not there was any other violation of a law or regulation).

13D filings, and also asserted damages claims for fraud under Delaware law. *See Diceon Elecs., Inc. v. Calvary Partners, L.P.,* 772 F.Supp. 859 (D.Del.1991). The District of Delaware repeatedly cited pendent jurisdiction as its basis for entertaining the common law fraud claims. *See id.* at 861–62, 869–70.

Under these principles, if NACCO were seeking to enforce Section 13 of the Exchange Act or asserting a claim for a violation of Section 13, that claim could be heard only by a federal court. This Court would not be able to consider it.[2] Some of the language in NACCO's complaint suggests that NACCO is trying to replead a Section 13 violation as a state law fraud claim. NACCO alleges, for example, that "[a]s a result of Harbinger's failure to disclose the information required in Schedule 13D filings, these filings were false and materially misleading." NACCO's answering brief at times creates a similar impression and cites to line item federal disclosure requirements. To the extent NACCO contends that violating the line item requirements for filling out a Schedule 13G or 13D gives rise inherently to a claim for common law fraud, I disagree. I do not believe that common law fraud provides a state law enforcement vehicle for federal line item disclosure mandates.

But NACCO's real beef is that the information in Harbinger's Schedule 13G and 13D filings was false and misleading, regardless of whether or not the information was required to be included under federal law. This issue can be adjudicated by this Court as a question of fact, separate and

independent from what the line items of Schedule 13G and Schedule 13D require. In making this determination, I will be ruling on questions of Delaware law, not federal law. This does not mean that I am precluded from considering federal precedent on matters such as whether a particular disclosure is false or misleading. As *Grable* and other decisions recognize, it is perfectly appropriate to consider federal standards and case law as guideposts and as persuasive authority. This does not convert a Delaware state law claim into a federal claim.

Nor do I believe, as Harbinger contends, that the disclosures called for by Schedule 13G and 13D are so inherently technical that I must necessarily cross the line into construing federal law in resolving questions of fact. In its Schedule 13D filings Harbinger made affirmative statements of fact that were true, false, or materially misleading because they were incomplete. I do not have to consider federal law to evaluate the truth, falsity, or misleading nature of the factual statements. Prior to September 14, 2006, Harbinger also disclosed that it had "no plan or proposal which relates to, or would result in, any of the actions enumerated in Item 4 of the instructions to Schedule 13D." Item 4 provides as follows:

> State the purpose of purposes of the acquisition of securities of the issuer. Describe any plans or proposals which the reporting persons may have which relate to or would result in:

**2.** *See, e.g., Lowenschuss v. Options Clearing Corp.,* 1989 WL 155767, at *2–3 (Del.Ch. Dec.21, 1989) (dismissing claim when exclusive federal jurisdiction existed for misconduct relating to options adjustment rules); *cf. Somerville S Trust v. USV Partners, LLC,* 2002 WL 1832830, at *6 (Del.Ch. Aug.2, 2002) (noting in a books and records action that this court "cannot ... determine whether [defendants'] false disclosures violated federal securities law" but permitting the plaintiffs to use the admittedly false Schedule 13Ds as "additional credible evidence of possible wrongdoing and mismanagement [by the defendants] under Delaware law").

(a) The acquisition by any person of additional securities of the issuer, or the disposition of securities of the issuer,

(b) An extraordinary corporate transaction, such as a merger . . . involving the issuer or any of its subsidiaries,

* * *

(g) . . . other actions which may impede the acquisition of control by any person. . . .

These disclosure requirements appear sufficiently straightforward such that I will not have any difficulty determining as a factual matter whether at the time Harbinger was making its pre-September 14 disclosures Harbinger in fact had a "plan or proposal which relates to, or would result in" one of the matters enumerated in Item 4. I have a similar view of my ability to evaluate the truth or falsity of Harbinger's Schedule 13G certifications.

Consistent with the Delaware Supreme Court's holding in *Rossdeutscher*, the ability of a Delaware court to hear a common law fraud claim based on statements made by a Delaware chartered entity in Exchange Act filings serves important Delaware interests. Four of the Harbinger defendants accused of fraud are Delaware entities. Although the federal government has an obvious interest in enforcing the disclosure scheme established by the Exchange Act, Delaware has a powerful interest of its own in preventing the entities that it charters from being used as vehicles for fraud. Delaware's legitimacy as a chartering jurisdiction depends on it. The fate of some jurisdictions during the competition for corporate charters at the turn of the twentieth century provides a cautionary tale:

The policy of West Virginia [at the time] was to offer the loosest, most liberal law of any state in the union. It was anticipated that such a law would attract a certain number of crooks and swindlers, and the West Virginia bar seemed to take a somewhat nonjudgmental attitude toward that possibility. The new policy was a resounding failure [and] West Virginia did quite poorly for a state actively seeking incorporations.

Charles M. Yablon, *The Historical Race Competition for Corporate Charters and the Rise and Decline of New Jersey: 1880–1910*, 32 J. Corp. L. 323, 365 (2007) (footnote omitted). South Dakota similarly failed to attract incorporations after it "acquired a reputation as home of wildcat mining stocks and other shady schemes." *Id.* at 366. In citing these historical examples, I intimate no criticism of either jurisdiction today.

If a Delaware entity engages in fraud or is used as part of a fraudulent scheme, that entity should expect that it can be held to account in the Delaware courts. I therefore hold that NACCO's fraud claim can go forward in this Court.

### 2. Falsity

To plead a fraud claim, NACCO must allege a fraudulent misrepresentation. Court of Chancery Rule 9(b) requires that fraud be pled with particularity. This standard requires that the plaintiff alleges "the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim." *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del.Ch. 2006). A defendant's state of mind, including its knowledge and intent, need not be pled with particularity but "may be averred generally." *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 158 (Del.Ch.2003); *see* Ct. Ch. R. 9(b). The pleading requirement also takes into account whether "the facts lie more in the knowledge of the opposing party than of the pleading party." *H–M Wexford LLC v. En-*

*corp, Inc.*, 832 A.2d 129, 146 (Del.Ch. 2003).

NACCO claims that Harbinger falsely stated it was acquiring shares for investment purposes when in fact it was purchasing shares to control or influence Applica, at a time when it had plans for a merger involving Applica, and at a time when it had plans to defeat NACCO's acquisition of Applica. NACCO also contends that Harbinger intentionally failed to disclose material facts about the actions Harbinger was taking, such as Harbinger's July 2006 proposal of a transaction to Applica's financial advisor, Harbinger's actions involving Salton and the July 2006 Salton proposal to Applica, or the true nature of Harbinger's August and September calls to Applica in which Harbinger expressed dissatisfaction with the Hamilton Beach Merger Agreement while at the same time trying to restore voting rights for its shares. Without those additional disclosures, NACCO contends, Harbinger's disclosures were materially incomplete and misleading.

Black letter law permits a misrepresentation regarding intent to form the basis for a fraud claim. "A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." Restatement (Second) of Torts § 530.

> The state of a man's mind is as much a fact as the state of his digestion. A false representation of the actor's own intention to do or not to do a particular thing is actionable if the statement is reasonably to be interpreted as expressing a firm intention and not merely as one of those 'puffing' statements which are so frequent and so little regarded in negotiations for a business transaction as to make it unjustifiable for the recipient to rely upon them.

*Id.*, cmt. a; *accord* 37 Am.Jur.2d Fraud and Deceit § 85 ("An existing purpose or state of mind may be misrepresented and thus constitute a misrepresentation of fact.").

Reading the Complaint as a whole, I find that it contains detailed allegations sufficient to plead that Harbinger's disclosures were false. I reach this conclusion for all of Harbinger's Schedule 13 disclosures, although I recognize that Harbinger's intent could well have changed between March and September 2006. Whether Harbinger in fact misrepresented its intent or whether some subset of Harbinger's statements was true are matters for the proofs, not the pleadings.

In concluding that NACCO has pled that Harbinger's statements of intent were false, I take into account the particularized allegations in the Complaint as a whole regarding the arc of Harbinger's disclosures and activities from March until September, 2006, as set forth in my account of the facts as pled. I do not hold that NACCO has pled falsity simply because Harbinger made a competing bid for Applica on September 14 and changed its intent on that date.

In arguing against any inference of falsity, Harbinger relies heavily on the Schedule 13D it filed on June 21, 2006, in which Harbinger reported that it had now acquired 32% of Applica stock. Although Harbinger's prior filings disclosed its purchases were "for investment purposes only," Harbinger now silently dropped the "only." Harbinger also added disclosure saying that it "reserve[d] the right to be in contact with members of [Applica's] management, the members of [Applica's] Board of Directors, other significant shareholders and others regarding alternatives that [Applica] could employ to maximize shareholder value." As I understand the argument, Harbinger contends that in the

language of M & A, these changes told the market, "we are going active." I do not regard Harbinger's disclosure as sufficiently clear to merit a pleadings stage dismissal.

First off, the dropping of the word "only" is a fig leaf. It suggests a minimalist revision contrived to provide an argument if a future dispute arose.

The reserving of the right to take the listed actions goes one step better. But as NACCO points out, at the time Harbinger was claiming to "reserv[e] the right to be in contact with members of [Applica's] management," Harbinger in fact (as I must accept for pleadings purposes) had been engaging in secret communications with members of Applica management, who had been tipping Harbinger about the deal process. And at the time it was claiming to be holding shares of Applica "for investment purposes," Harbinger had acquired 30.8% of Applica's outstanding stock and invested $100 million in the preferred stock of Salton and another $100 million in its debt. Harbinger was analyzing Applica and Salton as a combined company and retaining a financial advisor to evaluate gaining "full/complete control of Applica." And Harbinger representatives were exchanging e-mails like "I think we pay cash for [Applica]—take it private—then bid [REDACTED] for Salton—then the world [would] be knocking on our door," and "[i]n the process we completely replace both boards with a new board of people we know and who get the joke." Harbinger was not reserving the right to consider "alternatives"; Harbinger was pursuing actively its preferred alternative of an Applica–Salton combination.

Harbinger also argues that it is widely believed in the community of hedge funds who frequently file Schedule 13Ds that one need not disclose any intent other than an investment intent until one actually makes a bid. Harbinger could not offer legal support for this view, and there has been a recent and persuasive rejection of a similarly self-serving, formalistic, and bright-line interpretation advanced by frequent Schedule 13D filers. *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F.Supp.2d 511 (S.D.N.Y.2008), *aff'd*, 292 Fed.Appx. 133 (2d Cir.2008). And unlike *CSX*, which interpreted the meaning of "beneficial ownership" under the Exchange Act, I am confronted with a question of intent, which is a question of fact. Nor am I suggesting that Harbinger had any Delaware law duty to update its disclosures. All I will do is evaluate factually whether Harbinger spoke falsely when it made the particular disclosures it chose to make.

Based on the allegations of the Complaint, NACCO has pled sufficiently that Harbinger's statements regarding its investment intent in its Schedule 13G and 13D filings were false or misleading. In reaching this conclusion, I recognize that my federal colleague considered a similar issue in the context of NACCO's applications for a temporary restraining order, preliminary injunction, and expedited discovery, and wrote that "the Court does not perceive any falsity in Harbinger's filing when they are properly viewed alongside unfolding events." *NACCO Indus., Inc. v. Applica Inc.*, 2006 WL 3762090, at *7 (N.D.Ohio Dec.20, 2006). That ruling was made in a different procedural posture and on a different record. The district court was asked on a highly expedited basis to consider applications for equitable relief. The district judge did so solely on a paper record consisting of NACCO's complaint, which did not contain references to e-mails and other documents from the Delaware action because the defendants stood on their confidentiality designations.

The district court's determination, made in the context of weighing the likelihood of success for purposes of an injunction application, was necessarily tentative and preliminary. It would not have been binding on the district court in a further proceeding, and it is not binding on me. I, by contrast, am tasked with judging the sufficiency of the Complaint under Rules 9(b) and 12(b)(6). Those rules mandate different standards than were applied by the district court, and I must grant all reasonable inferences to the plaintiff. Given the differences in procedural posture, it is understandable that the district court and I could reach different conclusions. For purposes of the motion to dismiss, I believe that NACCO has sufficiently alleged facts supporting a reasonable inference that Harbinger's statements were false or materially incomplete.

### 3. Reliance And Materiality

 Making a false statement is not a strict liability offense. To plead a claim of fraud, the defendant must have had "the intent to induce the plaintiff to act or refrain from acting," and the plaintiff must in fact have acted or not acted "in justifiable reliance on the representation." *H–M Wexford*, 832 A.2d at 144; *see* Restatement (Second) of Torts § 525 ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."). Equally important, the false statement must have been material. *Norton v. Poplos*, 443 A.2d 1, 6 (Del.1982); Restatement (Second) of Torts § 538.

 Where fraud is claimed based on a statement in an Exchange Act filing, the reliance inquiry plays an important role in legitimizing a Delaware court's ability to provide a remedy. Delaware's common law fraud remedy does not provide investors with expansive, market-wide relief. That is a domain appropriately left to the federal securities laws, the SEC, and the federal courts. Our law instead requires that a plaintiff show reliance, and our Supreme Court has declined to permit the fraud-on-the-market theory to be used as a substitute. *Gaffin*, 611 A.2d at 474. This does not mean that common law fraud only protects against misrepresentations made directly from one party to another. To the contrary, "[o]ne who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced." Restatement (Second) of Torts § 531.

 I am frankly troubled by the reliance inquiry. Even based on the unusual and extreme facts pled in the Complaint, I view it as a close call.

The relevant parties for purposes of the fraud claim are NACCO, the original acquirer, and Harbinger, the second bidder. The Complaint alleges that NACCO read Harbinger's Schedule 13 disclosures and relied on them in making decisions about how to proceed. This is exactly what happens in an M & A scenario. NACCO was entitled to treat Harbinger's disclosures as true and accurate, as the law required them to be. In another matter involving Harbinger, Vice Chancellor Lamb held that a target corporation was entitled to rely on Harbinger's filing of a Schedule 13G, indicating that its ownership of the target's stock was for investment purposes only, in concluding that Harbinger was

acting as a passive investor. *Openwave Sys. v. Harbinger Capital,* 924 A.2d 228, 243 (Del.Ch.2007). So too may NACCO.

I find it equally reasonable to infer that Harbinger drafted its securities filings carefully and intentionally, knowing that NACCO and other market participants would review them and rely on what Harbinger said it was doing. The Complaint's allegations of tipping imply that Harbinger knew a good deal about Applica's process, including about NACCO's involvement. For example in June, Maura described for Falcone the proposed structure of the Hamilton Beach merger, a month before the deal was signed up and announced. Although it is not clear how early Harbinger knew specifically about NACCO, it was NACCO's re-approach to Applica in early 2006 that led to Applica announcing a process to explore strategic alternatives, and the Complaint alleges that Harbinger was tipped about those events. I therefore find it reasonable to infer at the pleadings stage that Harbinger drafted its securities filings with NACCO in mind.

As NACCO has pled, Harbinger wanted to achieve control or influence over Applica because Harbinger saw the opportunity to merge Applica and Salton and generate a "massive gain." Consistent with this intent, Harbinger built positions in both Applica and Salton. As Maura wrote in April 2006, Harbinger could use a large position "to keep the bidders honest," *i.e.,* to influence who got control, or to "bid for [Applica] outright ourselves," *i.e.* to gain control. Acquiring a large position at a low price was economically rational for Harbinger. It would give Harbinger a built-in advantage in any bidding contest, because Harbinger already would have acquired a large portion of the stock at a low basis. And if Harbinger lost the bidding contest, Harbinger's profits would be greater.

Harbinger had at least two obvious reasons for wanting to build a significant position without its true interests being known. First, if the market suspected that a contest was in the offing, Applica's stock price would go up, and Harbinger's gains would be less massive. Maura understood this when he wrote in April that it was "cheaper to build [sic] the position now—rather than in Jun [sic] when there is a $4 bid on the table."

Second, and perhaps more important, NACCO could be expected to respond. Although I credit the allegations that Applica management favored Harbinger and was tipping them, I have no similar misgivings about the motives of the Applica board. Prior to entering into the Hamilton Beach Merger Agreement, the Applica board would have had no interest in allowing Harbinger to engage in a creeping takeover that would have given Harbinger the power to dictate the outcome of the board's process. The Applica board instead had a powerful interest in retaining control of its process and creating a competitive dynamic to maximize price.

Prior to the execution of the Hamilton Beach Merger Agreement, if NACCO understood that Harbinger was interested in control or influence and accumulating a large stake for that purpose, NACCO could have sought to have Applica take action in response, and NACCO's and Applica's interests would have been aligned. NACCO could have asked Applica to modify NACCO's standstill agreement so that NACCO could buy shares, and Applica might have agreed to let NACCO take some balancing position. This Court has recognized that the board of directors of a target corporation must comply with its fiduciary duties when enforcing standstill provisions. *See In re Topps Co. S'holders Litig.,* 926 A.2d 58, 91 (Del.Ch.2007) ("[A] board is bound to use its contractual power

under [a standstill] only for proper purposes"). The Applica board could well have concluded that permitting NACCO to take a limited balancing position would assist the board in retaining control of its process and obtaining the best transaction reasonably available.

More likely, NACCO could have suggested that Applica cap Harbinger with a rights plan. This is an action that Applica logically would have taken in response to the threat of a creeping takeover. *See Louisiana Mun. Police Employees' Ret. Sys. v. Fertita,* 2009 WL 2263406, at *8 (Del.Ch. July 28, 2009) (declining to dismiss claim that board breached its fiduciary duties by failing to employ a rights plan to block a creeping acquisition attempt, when considered "together with other suspect conduct"). NACCO also might have suggested that Applica sue Harbinger for Section 13 violations, and to protect its process, Applica might have done so.

After the execution of the Hamilton Beach Merger Agreement, if NACCO had learned the truth about Harbinger's plans, NACCO had the same ability to ask Applica to release NACCO from its standstill or adopt a rights plan. And at that point, NACCO also had rights under the Hamilton Beach Merger Agreement, which required Applica in Section 6.4 to use "reasonable best efforts to cause all of the conditions" to closing to be met.

In addition, had Harbinger's disclosures been candid, NACCO could have moved earlier to enforce the Hamilton Beach Merger Agreement. If NACCO had been able to move earlier, this Court might have been able to accommodate the expedited trial that NACCO originally requested. Because of the factual disputes in this case, this Court only could have issued a mandatory injunction or other affirmative and compulsory relief, such as an order of specific performance, after trial. *Holling-*

*er Int'l v. Black,* 844 A.2d 1022, 1060 (Del. Ch.2004) (noting that the court could grant a mandatory injunction only as post-trial relief); *City Capital Assocs. Ltd. P'ship v. Interco Inc.,* 551 A.2d 787, 795 (Del.Ch. 1988) (Allen, C.) (explaining that a mandatory injunction can only be granted prior to trial based on undisputed facts); *see, e.g., In re IBP, Inc.,* 789 A.2d 14, 23 & n. 1 (Del.Ch.2001) (conducting expedited trial prior to issuance of order of specific performance). As events turned out, NACCO did not seek relief until November 13, 2006, and this Court was unable to schedule a timely expedited trial. I do not fault NACCO for deciding not to continue the expedited proceeding it filed in Delaware once it became clear that mandatory relief was effectively unavailable. With truthful disclosures from Harbinger, NACCO might well have filed suit sooner.

In reaching these conclusions, I recognize that the Applica board had some interest in facilitating a topping bid, and that passively allowing Harbinger to establish a position served that goal. We will never know with certainty what would have happened along the alternative timeline I am forced to contemplate. But for present purposes, I conclude that NACCO has alleged a reasonable theory as to why Harbinger sought to mislead NACCO through its Schedule 13 filings and how NACCO reasonably relied to its detriment on Harbinger's disclosures.

This is not to say that NACCO could rely naïvely on what Harbinger said. At some point, NACCO was obligated to protect itself. But this is a difficult line to draw. After Applica announced publicly that it was exploring strategic alternatives, arbitrageurs and hedge funds would naturally move into the stock. Harbinger's initial Schedule 13 filings were thus relatively routine. Nor did Harbinger's continued buying give rise to immediate con-

cerns. Sophisticated investors could readily be expected to continue to accumulate shares after the announcement of the Hamilton Beach Merger Agreement. This transaction contemplated a stock-for-stock merger to create a new entity that would benefit from the synergistic effects of the combination. Investors like Harbinger could recognize the potential value of this transaction and seek to get in on the ground floor, potentially via significant stakes.

In candor, I have sympathy for the proposition that at some point it became unreasonably naïve for NACCO to trust that a hedge fund engaging in conduct resembling a creeping takeover wanted only to receive its ratable share of the benefits of the existing deal. But the line when NACCO's reliance became unreasonable is difficult to draw and is not something I will address on a motion to dismiss. I also resist the idea of insulating wrongdoers and penalizing victims because a fraud arguably became sufficiently apparent that the victim should have known better. I likewise resist the idea that some market players could insulate themselves at the pleadings stage from claims based on false disclosures by arguing that others should know how close to the line they like to play and that their disclosures really should never be believed.

It is thus reasonable to my mind at the pleadings stage that NACCO relied on Harbinger's disclosures in deciding what to do and what not to do, and that Harbinger's false disclosures were material to NACCO. This is a case-specific ruling. It is critical that the Complaint has alleged a reasonable basis for me to infer that Harbinger intentionally made false disclosures about its investment intent in a context where Harbinger expected NACCO to review and rely on them and where NACCO reasonably did so.

### 4. Causally–Related Damages

 To be actionable, a false statement must cause harm. *H–M Wexford LLC*, 832 A.2d at 144–45. The necessary causal connection has two dimensions. First, the false statement must be a factual cause of the harm in the sense that the harm would not have occurred but for the false statement. Second, the false statement must be a legal cause of the harm, meaning that the false statement must be a sufficiently significant cause of the harm to impose liability. Restatement (Second) of Torts § 548A, cmt. a-b; *see* 37 Am. Jur.2d Fraud and Deceit § 281 (discussing requirements of but-for and proximate cause). The second limitation recognizes that the harm flowing from an event in the but-for sense at some point becomes too attenuated to give rise to liability. Our law will not award damages for a kingdom when the wrong concerns a two-penny nail.

 As with the element of reliance, I view the question of causally related damages as a close one, and NACCO's theory has potential difficulties. But at the motion to dismiss stage, largely for the reasons discussed in my analysis of the reliance argument, I believe that NACCO has sufficiently pled that it suffered harm causally connected to Harbinger's false disclosures. I recognize that it is not necessarily true that NACCO would have consummated the Hamilton Beach Merger Agreement but for Harbinger's fraud. Harbinger might have outbid NACCO anyway, or Applica's stockholders might have voted down the Hamilton Beach Merger Agreement. But our law does not require that a fraud victim plead what *"necessarily"* would have happened. *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, 1996 WL 189435, at *6 (Del.Ch. Apr.16, 1996) (Allen, C.) (emphasis in origi-

nal). A plausible theory is sufficient at the pleadings stage. *Id.*

Here, NACCO emerged from the Applica process with a signed merger agreement for a synergistic transaction. NACCO plausibly contends that Harbinger's fraud enabled Harbinger to amass a nearly 40% position in Applica's common stock at a low cost basis, while NACCO was bound by a standstill, thereby giving Harbinger an insurmountable advantage in the subsequent bidding contest. As described in the previous section, I accept for purposes of the motion to dismiss that NACCO would have acted differently had it known earlier about Harbinger's control purpose. Although the actions NACCO alleges it would have taken were not within NACCO's control, the Applica board shared NACCO's interests in pursuing them. After the execution of the Hamilton Beach Merger Agreement, Applica had a contractual obligation to use its reasonable best efforts to pursue the merger.

I find it plausible, indeed reasonable, to infer at the pleadings stage that the primary reason NACCO failed in the bidding contest was the nearly 40% block that Harbinger amassed while NACCO was restricted by the standstill agreement. For each increment in the resulting bidding, NACCO bore 100% of the cost, but Harbinger only bore 60% of the cost. Harbinger was bidding with 60 cent dollars. I also find it reasonable, to infer at the pleadings stage that NACCO only enjoyed an advantage of this magnitude and was able to defeat the Hamilton Beach deal because of its fraudulent Schedule 13 disclosures. I credit NACCO with the inference at this stage of the case that it did not continue bidding for Applica because it could not overcome Harbinger's advantage. I further credit NACCO with the inference at the pleadings stage that if Harbinger had not possessed the advan-

tage of a nearly 40% block procured by fraud, NACCO could have outbid Harbinger.

Although the question is close, I hold at the pleadings stage under the extreme facts pled that NACCO can seek damages for the loss of the Hamilton Beach merger under a fraud theory. I may well conclude after trial that Harbinger did not engage in fraud, that NACCO did not establish a but-for connection between Harbinger's fraud and the loss of the Hamilton Beach transaction, or that the line of dots connecting the two is too attenuated for Harbinger's fraud to be a legal cause of the loss. But given the allegations of the Complaint, I will not make those determinations on a motion to dismiss. Count IV will proceed.

### 5. Equitable Fraud

 I reach a different conclusion regarding Count V, in which NACCO asserts a claim for equitable fraud. NACCO is a sophisticated party, none of the defendants occupied a special relationship towards NACCO, and nothing about the case suggests any other equity that has traditionally moved this Court to relax the pleading requirements for fraud. Equitable fraud is not appropriately invoked in this case. *See U.S. West, Inc. v. Time Warner, Inc.,* 1996 WL 307445, at *26 (Del.Ch. June 6, 1996) (Allen, C.). Therefore, I dismiss Count V.

### E. Count III States A Claim For Tortious Interference With Contract.

Having addressed the fraud claims, I now return to Count III, where NACCO asserts a claim for tortious interference with contract against Harbinger. I decline to dismiss Count III.

 "The tort of interference with contractual relations is intended to protect a promisee's economic interest in the per-

formance of a contract by making actionable 'improper' intentional interference with the promisor's performance." *Shearin v. E.F. Hutton Group, Inc.,* 652 A.2d 578, 589 (Del.Ch.1994) (Allen, C.). As traditionally framed, a claim for tortious interference with contract requires "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del.Ch.1987) (Allen, C.). There can be no meaningful dispute about the existence of the Hamilton Beach Merger Agreement or Harbinger's knowledge of it. Based on my analysis of Count I, NACCO has pled a claim for breach of contract and has alleged injury flowing from the breach. The issues are therefore elements (3) and (4).

■■■ This Court has held that a plaintiff pled a claim for tortious interference with a covenant not to compete when the defendants set out to form a competing business and intentionally solicited the assistance and involvement of an individual whom they knew was bound by the covenant. *See TriState Courier & Carriage, Inc. v. Berryman,* 2004 WL 835886, at *12 (Del.Ch. Apr.15, 2004). Vice Chancellor Noble accepted for pleading purposes that the defendants' solicitations were a substantial factor in causing a breach of the covenant. *Id.* Here, as discussed in my analysis of Count I, the Complaint adequately alleges that Harbinger knew about the No–Shop Clause and Prompt Notice Clause, but nevertheless engaged in contacts and communications that violated those clauses. As in *Tri–State,* this is sufficient for pleading purposes.

I also believe that the detailed allegations of fraudulent statements that I discussed in analyzing Count IV provide a sufficient basis for a claim of tortious in-terference. In denying a motion to dismiss a counterclaim for tortious interference with prospective business relations, a tort that is conceptually similar to tortious interference with contract, Vice Chancellor Strine ruled that the element of wrongfulness was met where the alleged interferer made false and misleading statements of fact about the counter-claimant. *Agilent Technologies, Inc. v. Kirkland,* 2009 WL 119865, at *8 (Del.Ch. Jan.20, 2009). As he noted, "claims for unfair competition and tortious interference must necessarily be balanced against a party's legitimate right to compete," but misrepresentations of fact "are not legitimate vehicles of competition." *Id.*

The fact pattern alleged in the Complaint differs from *Agilent,* but similar principles are involved. As in *Agilent,* the Complaint alleges sufficiently that Harbinger did not limit itself to "legitimate vehicles of competition" when seeking to acquire Applica. Harbinger instead made false statements to hide its intent and get the drop on NACCO.

For purposes of the tortious interference analysis, I also take into account Harbinger's success in acquiring a nearly 40% stock position, facilitated at least in part through its false disclosures. Vice Chancellor Strine held a defendant liable for tortious interference where the defendant obtained an unfair advantage by using confidential information it had obtained from other defendants in violation of contractual agreements with the plaintiff. *Cura Fin. Servs. v. Elec. Payment Exch., Inc.,* 2001 WL 1334188, at *18 (Del. Ch. Oct.22, 2001). Harbinger similarly obtained an unfair advantage over NACCO by accumulating a large stock position based on false disclosures. Because of Harbinger's actions, NACCO did not receive the full benefit of the contractual protections that NACCO bargained for,

including the superior proposal mechanism for filtering Applica's access to topping bids. NACCO instead faced a competing bidder with a significant leg up thanks to its improper activities.

At this stage of the case, I believe that NACCO's allegations are adequate to support the contention that Harbinger acted wrongfully in a manner that was a substantial factor in Applica's breaches of the Hamilton Beach Merger Agreement. Harbinger intentionally engaged in improper actions that interfered with NACCO's rightful expectations of performance. I therefore decline to dismiss Count III.

### F. Counts VI Has Been Abandoned.

Count VI of the Complaint asserts a claim for aiding and abetting a breach of fiduciary duty. In response to the defendants' motion to dismiss and opening brief, NACCO chose not to defend this claim, consented to its dismissal, and did not mention it further. I dismiss it.

### G. Count VII States A Claim For Civil Conspiracy For Fraud Against Applica.

Count VII of the Complaint asserts a claim for civil conspiracy. To successfully plead a claim for civil conspiracy under Delaware law, a plaintiff must allege "(1) [a] confederation or combination of two or more persons; (2)[a]n unlawful act done in furtherance of the conspiracy; and (3)[a]ctual damage." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149–50 (Del.1987). Each conspirator "is jointly and severally liable for the acts of co-conspirators committed in furtherance of the conspiracy." *Id.* at 150.

NACCO first claims that Harbinger conspired with Applica to breach the Harbinger Merger Agreement. Although the elements of a claim for civil conspiracy are flexible, it is essential that there be an underlying wrongful act, such as a tort or a statutory violation. *Empire Fin. Servs. v. Bank of New York (Delaware)*, 900 A.2d 92, 97 (Del.2006). A breach of contract is not an underlying wrong that can give rise to a civil conspiracy claim. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 892 (Del.Ch.2009). NACCO therefore cannot state a claim for civil conspiracy by alleging that Applica and Harbinger conspired to breach the Hamilton Beach Merger Agreement.

NACCO fares no better to the extent it means to suggest that Harbinger has engaged in tortious interference with contract, and that Applica can be held liable under a theory of civil conspiracy for that tort. Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties. *See, e.g., Abry Partners*, 891 A.2d at 1061 (describing policy and discussing authorities). Delaware also recognizes the concept of efficient breach. *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1039 (Del.Ch.2006). Delaware law generally elevates contract law over tort to allow parties to order their affairs and bargain for specific results, to the point where Delaware law enforces contractual provisions that eliminate the possibility of any tort liability short of actual fraud based on explicit written contractual representations. *Abry Partners*, 891 A.2d at 1061–64. A claim of conspiracy to commit tortious interference against a party to the contract would undercut these principles and replace the predictability of the parties' agreement with a far less certain, after-the-fact, judicially-fashioned tort remedy. Recognizing such a round-about claim would circumvent the limitations on tort liability that are a fundamental aspect of Delaware law.

Thus, to the extent Count VII asserts that Applica and Harbinger conspired to breach the Hamilton Beach Merger Agreement, I dismiss the claim. Likewise, to the extent Count VII attempts to sue Applica in tort for a civil conspiracy to engage in tortious interference, I dismiss the claim.

NACCO last asserts that Applica conspired with Harbinger and therefore should be liable civilly for Harbinger's fraud. The claim of fraud readily meets the requirement for an underlying wrong. The Complaint alleges sufficiently that Applica management sought to advance Harbinger's bid by tipping Harbinger about non-public events in the deal timeline, assisting Harbinger in accumulating blocks of Applica stock to facilitate Harbinger's ability to influence the outcome of the Hamilton Beach merger or make a competing bid, making an outgoing communication to Harbinger after the Hamilton Beach Merger Agreement was announced to solicit an all-cash bid, and delaying providing information to NACCO at Harbinger's request and even providing false information to NACCO to further Harbinger's agenda. This is sufficient to state a claim for civil conspiracy based on the fraud.

## IV. CONCLUSION

This is a pleadings-stage decision. It determines only whether NACCO can proceed with its claims. Whether NACCO ultimately prevails and obtains a remedy will depend on the evidence presented, any defenses, and the ultimate equities of the case.

The parties shall confer on a scheduling order that will bring this matter to trial within twelve months. If the parties have any difficulty reaching agreement, I will be happy to assist.

The defendants' motion to dismiss is thus GRANTED IN PART and DENIED IN PART. **IT IS SO ORDERED.**