**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

June 19, 2017

Michael P. Kelly, Esquire
Andrew S. Dupre, Esquire
Benjamin A. Smyth, Esquire
McCarter & English, LLP
405 North King Street, 8th Floor
Wilmington, DE 19801

Robert A. Penza, Esquire
Christopher M. Coggins, Esquire
Polsinelli PC
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801

Re: *Brace Industrial Contracting, Inc., et al., v. Peterson Enterprises, Inc., et al.*, Civil Action No. 11189-VCG

Dear Counsel:

This Letter Order resolves what I believe to be the legal issues remaining before the matter is referred to a Special Master for resolution of certain issues of fact. It has been a long road to get to this point, and the inordinate lapse of time is an evil for which I, and not the parties or their counsel, must take responsibility. Below, I state my rationale for my decision on these remaining legal issues.

## I. BACKGROUND

This matter involves the purchase by one of the Plaintiffs, Brace Industrial Contracting, Inc., of the business unit Peterson Industrial Scaffolding ("PIS") from

one of the Defendants, Peterson Enterprises, Inc. (the "Acquisition").[1] Brace Industrial Contracting, Inc. ("Brace") "is a Delaware corporation that provides diversified and integrated industrial services within the power generation, agriculture, maritime, commercial, petrochemical, and oil and gas markets."[2] PIS "sells scaffold, rents scaffold, erects and dismantles ("E&D") scaffold, designs scaffold layouts, and manages the deployment and use of scaffold assets."[3] Peterson Enterprises, Inc. ("PEI") is a holding company that owns a subsidiary, Vernon L. Goedecke, Inc. ("Goedecke"), and that previously owned PIS.[4] To consummate the Acquisition, the parties executed a series of contracts, including, as relevant for this Letter Order, a stock purchase agreement (the "SPA"),[5] a transition services agreement (the "TSA"),[6] and an escrow agreement (the "Escrow Agreement") pursuant to which $1.87 million of the purchase price was placed into escrow.[7] This $1.87 million was to be released to PEI in equal halves at two different points in time, absent outstanding indemnification claims.[8]

---

[1] The "Plaintiffs" are Brace Industrial Contracting, Inc. and Peterson Industrial Scaffolding, Inc. The "Defendants" are Peterson Enterprises, Inc., Ronald A. Peterson, Eric Peterson, Kirk Peterson, Ronald A. Peterson Revocable Trust, Ronald A. Peterson 2010 Irrevocable Trust, and Vernon L. Goedecke, Inc.

[2] Pretrial Stipulation ("Pretrial Stip.") at 4 (Mar. 18, 2016).

[3] *Id.* at 5. I note that PIS now operates under the name "Platinum." *Id.* at 1.

[4] *Id.* at 4–5.

[5] JX 70 (the "SPA").

[6] JX 68 (the "TSA").

[7] Pretrial Stip. 9–10.

[8] *Id.* at 10.

The Plaintiffs filed their Amended Verified Complaint (the "Complaint") on August 20, 2015 alleging nine different counts regarding claims over restrictive covenants, the transfer of inventory under the SPA, and the usurpation of customer payments pursuant to the TSA.[9] The Defendants answered the Complaint and filed three counterclaims against the Plaintiffs on October 19, 2015 arguing primarily for indemnification under the "Further Assurances" provision of Section 5.7 of the SPA.[10] According to the Defendants, the Plaintiffs "fail[ed] to take such further actions as may be reasonably required to carry out the provisions of the SPA and give effect to the Transactions"[11] essentially because, in the Defendants' view, the Plaintiffs failed to make certain cash payments owed to the Defendants.[12] The matter was tried for two days and I resolved the majority of the claims over the restrictive covenants and the inventory in a Memorandum Opinion on October 31, 2016.[13] That decision found that Brace was entitled, on the claims resolved there, to $725,059. Before submitting the remainder of the issues to a Special Master, the parties

---

[9] Am. Verified Compl. (Aug. 20, 2015).

[10] Defs' Answer to Am. Verified Compl. with Countercl. ¶¶ 43–65 (Oct. 19, 2015). The Defendants also sought a declaratory judgment that Brace was not entitled to indemnification. *See id.*

[11] *Id.* at ¶ 62.

[12] *See* Defs' Post-Trial Opening Br. 48–55 (listing Cobra payments paid by Peterson, commissions due to Peterson employees, post-closing payroll payments, allegedly incorrectly remitted receivables, forklift payments, general ledger entries, weekly hourly billings, monthly software charges, equipment rentals, commissions, and flight invoices, among other things).

[13] *Brace Indus. Contracting, Inc. v. Peterson Enterprises, Inc.*, 2016 WL 6426398 (Del. Ch. Oct. 31, 2016).

submitted supplemental letters on, in their view, outstanding issues of law remaining to be decided. I held an in-court conference on these issues on February 24, 2017. On March 3, 2017, I issued a Letter Order declaring that no interest should accrue on the $725,059 indemnification award and directing the Plaintiffs to submit a form of order to immediately release the $725,059 from escrow. This Letter Order addresses the remaining primary issues of law I find necessary to decide before submitting the matter to the Special Master, namely, the ownership of certain equipment and the Defendants' "set-off counterclaim."

## II. ANALYSIS

### A. Equipment

The Defendants argue that at the time that the Acquisition closed, Brace was in possession of Goedecke equipment that was not on any of the disclosure schedules or any of the balance sheets. According to the Defendants, "the understanding was that Brace was to return this equipment to Goedecke."[14] The Defendants also argue that, after closing, Brace rented certain pieces of equipment from Goedecke and allege that Brace has not returned this equipment to the Defendants. The Defendants claim they are owed the value of these alleged unpaid rental payments, which they claim amounts to $442,657.24, as well as the underlying equipment. The Plaintiffs simply counter that the equipment belongs to them, because it was property of the

---

[14] Defs' Letter on Remaining Issues at C-1 (Jan. 6, 2017) (Dkt. No. 186).

4

PIS business which they acquired.[15]  In light of the evidence presented at trial, I find the Plaintiffs' position the more persuasive.

At trial, Eric Peterson, COO of PEI, conceded that he had converted the PEI inventory system, post-Acquisition, in a way purporting to show that items at PIS sites belonged to Goedecke, and that he had created back invoices for these items more than ten months after the initial sale to Brace.[16]  Eric Peterson explained that he "took an accounting of all the Goedecke equipment that wasn't on the SPA in all the [scaffolding] branches and moved it into rental contracts" for tracking purposes.[17]  Eric Peterson justified this post-acquisition accounting by contending that the parties' intention was that this equipment would be returned or paid for separately; he conceded that, to demonstrate that intention, he relied on "a verbal agreement on a lot of this."[18]  The SPA contains an entireties clause recognizing that the SPA "constitutes the sole and entire agreement" and "supersedes all prior" oral understandings and agreements.[19]  To the extent that the Defendants offer a prior oral agreement to vary the terms of the contract, I may not consider it.[20]

---

[15] *See* Oral Arg. Tr. 38:23–39:2 (Feb. 24, 2017).
[16] Trial Tr. 607:9–19 (Eric Peterson).
[17] *Id.* at 606:12–22 (Eric Peterson).
[18] *Id.* at 612:11–15 (Eric Peterson).
[19] SPA § 7.4.
[20] *See, e.g.*, *Carlson v. Hallinan*, 925 A.2d 506, 522 (Del. Ch. 2006) ("The parol evidence rule bars the admission of preliminary negotiations, conversations and verbal agreements when the parties' written contract represents the entire contract between the parties.") (internal quotation marks omitted).

The Defendants had the burden of proof at trial to demonstrate that its equipment—equipment not covered by the contract and that the parties intended should not be transferred—was nonetheless in the possession of Brace. Peterson's evidence and testimony was, to my mind, litigation driven and unpersuasive. I find that the Defendants have not met their burden of proof on this issue based on the evidence at trial.

*B. The so called "Set-Off Counterclaim"*

I now address several legal defenses raise by Brace to the so-called "Set-Off Counterclaim" of the Defendants. Under the contracts between the parties, the Defendants received payment from customers of PIS that belonged to Brace; in light of the Plaintiffs' disputed claims against the amount in escrow, the Defendants retained certain of these payments, which they must ultimately remit to Brace (the "Customer Payments Claim"). When the Defendants answered the Complaint, they also filed three counterclaims against the Plaintiffs, alleging payments due them from Brace under the contracts between the parties. In accordance with those counterclaims, the Defendants provided a Notice of Direct Claims and a Set-Off Notice to the Plaintiffs, pursuant to which the Defendants set aside customer payments made to the Defendants as agents for Brace, as described above. In other words, the Defendants are holding a sum of money that they received on behalf of Brace; they wish to "set-off" the value of their various counterclaims from this

6

amount, and remit only the net amount—if any—owed Brace. The parties refer to what is essentially a defense to the Customer Payments Claim as the "Set-Off Counterclaim." If the Set-Off Counterclaim survives as a matter of law, it will be submitted to the Special Master along with the other remaining matters for a computation of the net amount owed by the Defendants to Brace.

The Plaintiffs have presented several legal defenses to the Set-Off Counterclaim. They ask that I find that these defenses bar the Set-Off Counterclaim, with the result that judgment must be entered in Plaintiffs' favor on their Customer Payments Claim, without further reference to the Special Master.[21] The Defendants argue that Brace's defenses fail as a matter of law, and that the Special Master must first determine what value, if any, inheres in their counterclaims, and reduce the Customer Payments Claim accordingly.

According to the Plaintiffs, the Set-Off Counterclaim must be dismissed because set off of a "contingent unliquidated sum" is impermissible under our law, and because set-off is not permitted under the SPA.[22] The Plaintiffs also argue that the Defendants have unclean hands[23] and that the Defendants' expert testimony on

---

[21] Pls' Memorandum of Law Regarding Outstanding Issues at 6 (Jan. 6, 2017) (Dkt. No. 184).
[22] *Id.* at 2.
[23] I do not find unclean hands a viable defense in this matter for the reasons explained at the In Court Office Conference held on February 24, 2017. *See* Oral Arg. Tr. 19:4–20:10 (Feb. 24, 2017).

7

the Set-Off Counterclaim should be excluded.[24]  I address each in turn below, and find that the Defendants have the best of each issue.

### 1. The SPA does not bar the Set-Off Counterclaim

Section 6.7 of the SPA provides that at a party's sole discretion, such party may "set off all or any portion of the claimed amount of any . . . Direct Claim against any amount otherwise payable under *this Agreement*."[25]  The Plaintiffs point to Section 6.7's restriction to "this Agreement" and argue that the Set-Off Counterclaim does not attempt to set off an amount payable *under the SPA* because it sets off customer payments owed to them under the TSA.[26]  Therefore, according to the Plaintiffs, the Set-Off Counterclaim is not authorized by Section 6.7 of the SPA.

It seems to me, however, that the Set-Off Counterclaims does set off an amount payable under the SPA, because the SPA incorporates the TSA.  The SPA defines "Agreement" as "this Stock Purchase Agreement," that is, the Agreement is the SPA.[27]  Section 5.7 of the SPA requires each party to "execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out *the provisions hereof and*

---

[24] Pls' Memorandum of Law Regarding Outstanding Issues at 2, 5–6.
[25] SPA § 6.7 (emphasis added).
[26] Pls' Memorandum of Law Regarding Outstanding Issues at 4.
[27] SPA Preamble.

*give effect to the Transactions*."[28]   The SPA then defines "Transactions" as "the transactions contemplated by this Agreement *and the other Transaction Documents*,"[29] which are defined as "this Agreement, the Escrow Agreement, and other agreements, instruments and documents required to be *delivered* at Closing."[30] SPA Section 2.3 in turn provides the "Transactions to be Effected at *Closing*" and requires the Plaintiffs to *deliver* the TSA signed by them to the Defendants and the Defendants to also *deliver* the TSA signed by them to the Plaintiffs.[31]   Accordingly, under the terms of the SPA, the TSA—pursuant to which the Plaintiffs are owed customer payments—must be created, executed and delivered.  The SPA cannot be consummated without the incorporation of the TSA.   I find under these circumstances that the TSA is incorporated into the SPA, such that "amounts payable under this Agreement," under the facts here, includes the remittance of amounts collected by the Defendants pursuant to the TSA.  Thus, the Set-Off Counterclaim is authorized under the contractual relationship among the parties.

2. The Set-Off Counterclaim is contractual, and therefore not an impermissible set-off of a contingent, unliquidated claim

The Plaintiffs quote *CanCan Development, LLC v. Manno*[32] for the proposition that contingent, unliquidated claims cannot support a set-off

---

[28] *Id.* at § 5.7 (emphasis added).
[29] *Id.* at § 3.2 (emphasis added).
[30] *Id.* at Ex. A.
[31] *Id.* at § 2.3.  I note that the TSA also references the SPA in its opening recitals.  *See* TSA Recitals.
[32] 2011 WL 4379064, at *5 (Del. Ch. Sept. 21, 2011).

counterclaim.[33] Vice Chancellor Laster explained in *CanCan* that "[t]here is no *right* to set-off of a possible unliquidated liability against a liquidated claim that is due and payable."[34] In other words, a debtor may not at her discretion set against the amount owed what she claims to be an unrelated liability running from her creditor to her. My decision above makes this rationale inapplicable here, however.

The plaintiff in *CanCan* was not attempting to vindicate a *contractual* right to a set-off counterclaim, as are the Defendants here. While no *right* to set-off unliquidated sums may exist at common law or in equity, our law encourages parties to contract freely to create those contractual rights they see fit.[35] As discussed above, Section 6.7 of the SPA provides that, at its sole discretion, a party may "set off all or any portion of the claimed amount of any . . . Direct Claim against any amount otherwise payable under this Agreement."[36] Accordingly, I find that the Set-Off Counterclaim is contractual, and the rationale of *CanCan* does not apply.

### 3. The Plaintiffs' Motion in Limine

The Plaintiffs make a final attempt to invalidate the Set-Off Counterclaim by arguing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[37] to exclude the

---

[33] Pls' Memorandum of Law Regarding Outstanding Issues at 3.
[34] *CanCan,* 2011 WL 4379064, at *5 (quoting 80 C.J.S. *Set–Off and Counterclaim* § 58 (2011)) (emphasis added).
[35] *See, e.g.*, *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) ("Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties.").
[36] SPA § 6.7.
[37] 509 U.S. 579 (1993).

Defendants' expert testimony on the Set-Off Counterclaim because the Defendants' expert did not perform any expert analysis, and to exclude it in any event as a sanction for non-compliance with the scheduling order. As an initial matter, it seems to me that expert testimony here is useful, but not required, for vindication of the Set-Off Counterclaim. Therefore, to the extent the Plaintiffs are correct that the Defendants' expert testimony should be excluded, this is not dispositive of the Set-Off Counterclaim.

Regardless, the Plaintiffs contend that the parties' dispute on this issue centers around "thousands of accounting transactions flowing through the Customer Payment lockbox that Peterson managed for Brace pursuant to the TSA."[38] The Plaintiffs then allege that the Defendants *refused* to produce the bank statements for this Customer Payments lockbox, which, according to the Plaintiffs, constitute the best evidence for these claims and which were relied on by the Defendants' expert.[39] The Plaintiffs, however, fail to mention in their supplemental letter that they conceded in their pre-trial Motion in Limine that they did receive these bank statements before trial.[40] That is, in their Motion in Limine, the Plaintiffs argued that Defendants' expert evidence should be excluded because these bank statements were provided, *but not timely*; they were allegedly due on January 22, 2016 but were

---

[38] Pls' Memorandum of Law Regarding Outstanding Issues at 5.
[39] *Id.* at 5–6.
[40] *See* Pls' Reply in Support of their Motion in Limine 3–4 (Mar. 17, 2016) (Dkt. No. 141).

11

not received until February 22, 2016.[41]  According to the First Amended Order Governing Case Schedule, however, the parties were required to "substantially complete document production" by January 22, 2016 but they were not required to exchange expert rebuttal reports and all material relied upon therein until February 26, 2016.[42]  Thus, it is not even clear to me that the Defendants provided the bank statements out of the agreed-to time.

Under the circumstances here, I find that justice requires consideration of the statements, even if they were provided late.  The Plaintiffs had sufficient time to respond to the Defendants' expert.  In their Motion in Limine, the Plaintiffs cite a Letter Opinion on a plaintiff's motion to amend a scheduling order in *Encite LLC v. Soni*[43] for the proposition that this Court should disallow an expert's report when it is filed after the deadline in a scheduling order, and when no justification exists to amend the order.[44]  However, here, the Plaintiffs ask me to exclude an expert's testimony based on tardily filed documents relied on in an expert's report, not the expert's report itself.  It seems to me that, especially in light of the current disposition of this litigation,[45] the Plaintiffs have had sufficient opportunities to prepare, present,

---

[41] *Id.*

[42] First Amended Order Governing Case Schedule at 2 (Dkt. No. 101).

[43] 2011 WL 1565181, at *1 (Del. Ch. Apr. 15, 2011).

[44] Pls' Reply in Support of their Motion in Limine at 4 (Mar. 17, 2016) (Dkt. No. 141).

[45] The Plaintiffs concede that they received the documents at issue on February 22, 2016. *Id.*  Over one year has since passed, in which occurred a trial, post-trial briefing, supplemental letters, and an in-court office conference.

and oppose any argument based on the bank statements. In the interests of justice, I decline the Plaintiffs' motion to exclude the expert report on this ground.

As to excluding Defendants' expert under *Daubert*, the expert testified to, among other things, not using an accounting methodology, and conceded he had based at least some of his conclusions on "ask[s] from Eric [Peterson]."[46] This may be relevant in examining the sufficiency of the evidence offered by the Defendants' expert, but it is not enough to exclude his testimony in the entirety. In any event, as I have found above, expert testimony is not necessary to the calculations that the Master must make with regard to the Set-Off Counterclaim. The Defendants have submitted sufficient evidence to put the question of set-off to the Special Master.

For all the reasons above, I find that the Set-Off Counterclaim, so called, is not invalid as a matter of law, and the amount of set-off applicable to the Plaintiffs' Customer Payments Claim, if any, under the rubric of the Defendants' counterclaims, must be referred to the Special Master for further resolution.

For the foregoing reasons, any remaining issues pertaining to the leftover equipment and Set-Off Counterclaim are referred to the Special Master.

To the extent the foregoing requires an Order to take effect, IT IS SO ORDERED.

---

[46] Trial Tr. 679:13–682:14 (Placht).

13

The parties should confer and provide me with a form of order referring remaining issues to the Special Master, and inform me of any remaining issues requiring my attention.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III