**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

ABIGAIL M. LEGROW
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
TELEPHONE (302) 255-0669

February 22, 2021

John M. LaRosa, Esq.
LaRosa & Associates LLC
1225 N. King Street, Suite 802
Wilmington, DE 19801

John L. Reed, Esq.
Peter H. Kyle, Esq.
DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801

Lawrence P. Schaefer, Esq.
Bert Black, Esq.
Schaefer Halleen, LLC
412 South Fourth Street, Suite 1050
Minneapolis, MN 55415

RE: ***Michael Buck v. Viking Holding Management Company LLC, et al.***
***C.A. No. N20C-08-249 AML (CCLD)***

Dear Counsel,

This breach of contract case follows the plaintiff's termination from his employment with one of the three affiliated limited liability companies named as defendants in this action. The plaintiff's employment compensation included membership interests in his employer's controlling entity. Upon termination of employment, the membership agreement permitted the controlling entity to

repurchase a member's interest, with the purchase price dependent on whether termination was with cause or without cause.

The plaintiff contends the three affiliated defendants mischaracterized his termination and deprived him of the value of his equity interests. The pending motion to dismiss requires the Court to determine whether the breach of contract and tortious interference with contract claims may proceed based on the plaintiff's conclusory allegation that he did not engage in any conduct within the agreement's definition of "cause." I conclude the complaint fails to state a reasonably conceivable claim, and I therefore dismiss the complaint without prejudice. My reasoning follows.

## Factual Background

Unless otherwise noted, this factual recitation is drawn from the complaint and the documents it incorporates by reference. Novus Media, LLC ("Novus") employed Plaintiff Michael Buck as its Chief Financial Officer from February 2016 until his termination in April 2020.[1] Viking Parent LLC ("Parent") wholly owns Novus. Viking Holding Management Company LLC ("Holdco" and together with

---

[1] Compl. ¶¶ 21, 31.

Parent and Novus, the "Viking Entities") is Parent's controlling stakeholder.[2] Non-party David Murphy is the managing member of all three Viking Entities.[3]

Buck's employment terms were memorialized in a letter agreement (the "Employment Agreement").[4] Novus and Buck are the Employment Agreement's only counterparties.[5] The Employment Agreement designates Buck as an at-will employee who may be "terminated . . . at any time with or without notice or cause for any reason not prohibited by law."[6]

In the year after Buck was hired, the Viking Entities engaged in a series of restructuring transactions that ultimately produced Holdco.[7] As an incentive for continued employment, Novus offered its executives, including Buck, membership interests under Holdco's LLC agreement (the "Membership Agreement").[8] None of the Viking Entities except Holdco is a party to the Membership Agreement.[9] In

---

[2] *Id.* ¶¶ 2, 10.

[3] *Id.* ¶ 3; Holdco's LLC agreement indicates Murphy is a trust. *See id.* Exhibit A, Holdco Membership Agreement § 1 (D.I. 1) (.pdf page 11) ("Membership Agreement"). The parties, however, refer to Murphy as an individual. Any ambiguity here is not relevant to this decision.

[4] Compl. ¶ 21; *see id.* Exhibit A, Novus Employment Agreement (D.I. 2) ("Employment Agreement").

[5] *See generally* Employment Agreement.

[6] *Id.* (.pdf page 4).

[7] Compl. ¶ 24.

[8] *Id.* ¶¶ 27-30.

[9] *See generally* Membership Agreement.

2017, Buck accepted Holdco's proposal and received 100 of Holdco's Class B Units

(*i.e.*, a 12.5% stake).[10]

Holdco's Class B Units are non-voting ownership interests subject to a

number of conditions, including Holdco's option to repurchase them should a

member's employment ever be terminated with or without "Cause."[11]    The

Membership Agreement defines Cause as an employee-member's:

> (i) material breach of the Membership Agreement or the Employment Agreement;

> (ii) conviction of, guilty plea or *nolo* plea to, any felony or crime involving moral turpitude or one that could be reasonably expected to have a significant adverse effect on the business or affairs of Holdco;

> (iii) substantial and repeated failure, after written notice from Holdco, to perform duties (or to refrain from actions) as reasonably directed by the Viking Entities;

> (iv) gross negligence, willful misconduct or breach of fiduciary duty with respect to the Viking Entities . . . or their business relations that results (or reasonably could be expected to result) in a significant adverse effect on the business or affairs of the Viking Entities; or

> (v) commission of any material act of dishonesty, fraud, theft or embezzlement, or breach of fiduciary duty, against the Viking Entities . . . or their business relations that results (or reasonably could be expected to result) in a significant adverse effect on the business or affairs of the Viking Entities.[12]

---

[10] Compl. ¶ 21; Membership Agreement, Schedule of Unit Holders (.pdf page 63).  Buck alleges his Holdco investment rose to a 17.17% stake by the time he was terminated.  Compl. ¶ 34.

[11] *See* Membership Agreement §§ 9.10(a)-(b).

[12] *Id.* § 1 (.pdf pages 7-8).

If Holdco elects to exercise its repurchase option, the purchase price depends on whether a unitholder is terminated with or without Cause.[13] If an employee-member is terminated *without* Cause, Holdco is limited to repurchasing the member's units at their current fair market value.[14] If an employee-member is terminated *with* Cause, however, Holdco may repurchase the units for "the lesser" of their (i) original cost, and (ii) current fair market value.[15]

On April 17, 2020, Novus fired Buck.[16] Holdco later determined Buck's termination was for Cause.[17] Holdco then exercised its repurchase option and "repurchased" Buck's units for $0.00, which was their original cost.[18] The fair market value of Buck's units was between $9 million and $10 million.[19] Buck, however, contends this repurchase contravened the Membership Agreement because there was no Cause for his termination. Believing he wrongfully was deprived of a valuable membership interest in Holdco, Buck sued the Viking Entities, alleging claims for breach of contract, breach of the implied covenant of good faith and fair

---

[13] *Id.* § 9.10(b).
[14] *Id.*
[15] *Id.*
[16] Compl. ¶ 31.
[17] *Id.* ¶¶ 31-32. Buck collapses or ignores the Viking Entities' legal separateness repeatedly throughout his complaint as needed to fit his theories. It seems reasonably clear (but not free from doubt) that Holdco allegedly was responsible for the Cause mischaracterization.
[18] *Id.* ¶ 44.
[19] *Id.* ¶¶ 35, 44. Buck alleges a contemporaneous appraisal produced a value ranging from approximately $9.46 million to approximately $10.49 million. *Id.* ¶ 35.

dealing, and tortious interference with contract. Buck named all three Viking Entities as defendants for his breach of contract and implied covenant claims and named only Novus as a defendant for his tortious interference claim.

In support of his claims, Buck alleges the decision to fire him with Cause was "effectively either made by [Novus], and executed by [Parent and Holdco], or made by [Novus] in conjunction with [Parent and Holdco]" because Murphy manages all three entities.[20] Buck avers he did not commit any of the acts defined as constituting "Cause" in the Membership Agreement.[21] He alleges the Viking Entities breached the Membership Agreement by mischaracterizing his termination as Cause-based, which led Holdco to repurchase Buck's units for cost.[22] The Cause characterization, Buck maintains, was "arbitrary" and contravened his expectation to be "treated honestly and fairly with regard to the characterization of any termination."[23] Finally, Buck contends Novus induced the breach by influencing Holdco in "bad faith" "for the sole purpose of . . . depriving him" of the fair market value of his investment.[24]

On October 12, 2020, the Viking Entities moved to dismiss Buck's complaint in its entirety under Superior Court Civil Rule 12(b)(6).[25] The defendants contend

---

[20] *Id.* ¶¶ 32, 43, 52, 56.
[21] *Id.* ¶¶ 36-41 (copying Cause definition and stating line-by-line that he committed none of those acts).
[22] *Id.* ¶¶ 47-48, 55, 61-62.
[23] *Id.* ¶ 56.
[24] *Id.* ¶ 62.
[25] D.I. 2.

Buck's complaint (1) is comprised exclusively of conclusory allegations; and (2) to the extent it is well-pleaded, fails to state a viable claim.[26] Buck elected to stand on his complaint as originally pleaded, arguing the claims satisfy Delaware's notice pleading standard.[27]

## Analysis

Dismissal is appropriate under Rule 12(b)(6) if the complaint fails to state a claim upon which relief can be granted.[28] In considering a motion to dismiss, the Court must: "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claim] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[29]

Delaware's pleading standard is "minimal."[30] But "the benefits of liberal construction afforded [a plaintiff] do not extend to 'conclusory allegations that lack specific supporting factual allegations.'"[31] Accordingly, the Court will dismiss a complaint if the plaintiff fails to plead specific allegations supporting each element

---

[26] *See generally* The Viking Entities' Opening Brief (D.I. 2).
[27] *See generally* Buck's Answering Brief at 2 (D.I. 11) ("Ans. Br.").
[28] *See* Del. Super. Ct. Civ. R. 12(b)(6).
[29] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).
[30] *Id.* at 536 (citation omitted).
[31] *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *6 (Del. Super. Ct. Jan. 13, 2021) (quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998)).

of a claim or if no reasonable interpretation of the alleged facts reveals a remediable injury.[32]

As an initial matter, Buck concedes Novus and Parent cannot breach express or implied obligations in the Membership Agreement because they are not parties to it.[33]   Accordingly, Buck's breach of contract and implied covenant claims are dismissed with prejudice as to those parties.  The remaining claims before the Court are (1) Holdco's alleged breach of contract; (2) Holdco's alleged breach of the implied covenant of good faith and fair dealing; and (3) Novus's alleged tortious interference with contract.

### A.    The complaint fails to state a breach of contract claim against Holdco.

In order to plead a breach of contract claim under Delaware law, a claimant must plead (1) the existence of a contractual obligation; (2) a breach of that obligation; and (3) damages resulting from the breach.[34]  Buck does not argue Novus lacked authority to terminate him or that Novus violated the terms of the Employment Agreement by doing so.  Instead, he contends Holdco wrongfully

---

[32] *Surf's Up*, 2021 WL 117036, at *6 (quotation marks and citations omitted); *see Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001); *see also Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (observing that a court need not draw "unreasonable inferences in favor of the non-moving party"), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 185 A.3d 1255, 1277 (Del. 2018).
[33] Ans. Br. at 2.
[34] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

characterized his termination as Cause-based.[35] That amounted to a breach of the Membership Agreement, Buck maintains, because it allowed Holdco to reacquire his units for cost rather than for their fair market value. But simply disagreeing with Holdco's Cause characterization in a conclusory fashion—without proffering facts suggesting the characterization actionably is incorrect—does not state a claim for breach of contract.[36] Buck cannot plead the "breach" element of his claim unless he makes non-conclusory allegations showing his termination does not meet the definition of Cause.

This Buck fails to do. His complaint merely echoes the five Cause definitions and baldly states he did not commit any of the described acts.[37] He neither articulates why he was (or may have been) terminated nor tethers Holdco to any findings implicated in Novus's termination decision. Indeed, Buck's allegation that Holdco "knew that the 'for [C]ause'" characterization was improper[38] does not even suggest how Holdco knew that was so.

---

[35] Ans. Br. at 11.
[36] *See, e.g., id.* at 14 ("Plaintiff has readily met Delaware's pleading requirements" by only alleging the Cause characterization was improper).
[37] Compl. ¶¶ 36-41.
[38] *Id.* ¶ 48.

In an attempt to salvage his complaint, Buck argued in his answering brief that he remains unaware of the basis for his termination.[39] Even if the Court accepted that unpleaded allegation, it does not support an inference that Novus lacked cause to terminate him or Holdco mischaracterized the termination. Buck's uncertainty, real or imagined, simply leads to the conclusion that he has not pleaded facts one way or the other. The Court need not strain to read an untold narrative into the complaint.[40] But, in any event, Buck's counsel conceded at oral argument that the assertion that Buck had no details regarding the reasons for his termination was false.[41] As such, the Court accords his argument no weight.

To resist the argument that his breach of contract allegations are conclusory, Buck relies on *Sheehan v. AssuredPartners, Inc.*[42] for the proposition that an

---

[39] *See* Ans. Br. at 5-6 ("Defendants have refused to provide [Buck] *any* details about" an investigative report purportedly leading to Buck's termination (emphasis added)); *id.* at 14 ("Defendants allude to [termination] documents . . . that have [been] hidden" from Buck).

[40] *See Malpiede*, 780 A.2d at 1083 (Court not required to advance "strained interpretations" of conclusory pleadings).

[41] Buck argued in his answering brief that he could not plead any facts because the defendants refused to provide "any details" regarding the investigation that prompted his termination. The defendants then attached to their reply brief a four-page, single-spaced letter sent to Buck's counsel setting forth the reasons for his termination. The Court considered that document only to rebut Buck's demonstrably false assertion that the details of the investigation were hidden from him. Buck's counsel admitted at oral argument that he was aware of the letter before he filed the answering brief. Buck's counsel's dissembling explanation for the false averments in Buck's answering brief do little to mollify the Court's concerns. Buck's counsel is hereby on notice that any similar incident in the future immediately will result in the Court (1) referring the issue to Delaware's Office of Disciplinary Counsel, and (2) issuing a rule to show cause as to why counsel's *pro hac vice* admission should not be revoked.

[42] 2020 WL 2838575 (Del. Ch. May 29, 2020).

employer's for-Cause termination decision, when rendered wrongfully, can sustain a breach of contract claim challenging an undervalued buyout. The *Sheehan* case, however, is distinguishable from this case in at least one important way. In *Sheehan*, the plaintiffs actually marshaled the putative reasons for their terminations and attacked those reasons as having been fabricated.[43] Presented with the specifics of the Sheehans' termination and non-conclusory allegations that the reasons for the termination were contrived, the *Sheehan* Court denied the defendants' motion to dismiss consistent with Delaware's minimal pleading standard. Here, in sharp contrast, Buck has not pleaded any of the Viking Entities' putative reasons for terminating him or alleged that those reasons were manufactured or false. And so, unlike in *Sheehan*, the Court cannot determine whether it is reasonably conceivable that Holdco's Cause characterization was rendered wrongfully. Accordingly, the breach of contract claim is dismissed for failure to plead breach.

### B. The complaint fails to state an implied covenant claim against Holdco.

The implied covenant of good faith and fair dealing inheres in all contracts and exists to fill unanticipated contractual gaps.[44] To state a claim for breach of the implied covenant, a claimant must allege: (1) a specific implied contractual

---

[43] *Id.* at *9-10; *see id* at *10 n.98 (citing Verified Amended Complaint at Exhibit 8, *Sheehan v. AssuredPartners, Inc.*, 2019 WL 5196660 (Del. Ch. Oct. 10, 2019)).

[44] *See Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017).

obligation; (2) a breach of that obligation; and (3) resulting damage.[45] The implied covenant "involves a cautious enterprise" in which a court infers contractual terms to fill gaps or developments that neither party anticipated.[46] A contracting party may not use the implied covenant to vary a contract's express terms.[47] Put differently, Delaware courts will use the implied covenant to fill gaps only when a contract truly is silent on the disputed issue.[48] As a result, where the express terms of an agreement govern a particular matter, an implied covenant claim regarding that matter is not viable and must be dismissed.[49]

The "gap" Buck identifies in the Membership Agreement is the absence of any language prohibiting Holdco from arbitrarily characterizing a member's termination as Cause-based when the termination lacked Cause.[50] This claim fails at its inception because the Membership Agreement's plain language expressly addresses this issue. Under Section 9.10(b), Holdco only may repurchase a member's units for the lesser of cost or fair market value if the termination is

---

[45] *Brightstar Corp. v. PCS Wireless, LLC*, 2019 WL 3714917, at *11 (Del. Super. Ct. Aug. 7, 2019) (quotation marks and citations omitted).

[46] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (internal quotation marks omitted).

[47] *See Brightstar*, 2019 WL 3714917, at *11 (When reviewing an implied covenant claim, "the express terms of a contract must always control." (citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005))).

[48] *See Brightstar*, 2019 WL 3714917, at *11; *accord Dunlap*, 878 A.2d at 441; *see also E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443-44 (Del. 1996).

[49] *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 8, 2018).

[50] Compl. ¶ 55.

supported by Cause, which the Membership Agreement defines.   If Holdco nevertheless applies that repurchase methodology when a member is terminated without Cause, then it breaches an *express* prohibition in the agreement.  In other words, Buck's implied covenant claim merely repackages his breach of contract claim.[51]  And, since he already has sued Holdco for breach of contract, the implied covenant claim is duplicative and must be dismissed.[52]

### C.   The complaint fails to state a tortious interference claim against Novus.

As explained, Buck has not sufficiently pleaded an underlying breach of the Membership Agreement.   That alone precludes Buck from maintaining the associated tortious interference claim.  Because I have determined, however, that Buck should be granted leave to amend his breach of contract claim, I also have considered Novus's alternative argument for dismissal.

To state a claim for tortious interference with contract, a plaintiff must plead (1) the existence of a contract, (2) about which the defendant knew, (3) an intentional and unjustified act that was a significant factor in causing the breach, and (4)

---

[51] *See Brightstar*, 2019 WL 3714917, at *11 ("[A]n implied covenant claim can't be used to re-write the agreement" or "create a free-floating duty unattached to the underlying document." (internal quotation marks and citations omitted)); *accord Nationwide Emerging Managers, LLC v. NorthPointe Holdings, LLC*, 112 A.3d 878, 897 (Del. 2015).

[52] *See Edinburgh Holdings*, 2018 WL 2727542, at *9 ("[I]f the contract at issue expressly addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not viable." (citations omitted)).

damages.[53]   As explained above, Buck does not challenge Novus's termination decision.   Instead, he speculates that Novus—because it is controlled by Murphy, who also controls Holdco—must have induced Holdco to mischaracterize his termination as being with "Cause."[54] That theory, however, contravenes Delaware's affiliate privilege doctrine.[55]

The affiliate privilege immunizes business organizations from tort liability for their affiliates' contractual breaches.[56] The privilege is qualified, however, and does not protect non-party affiliates that induce breaches in bad faith.[57] Delaware courts are reluctant to find bad faith because affiliate interference often is a legitimate business strategy.[58] When evaluating a plaintiff's claim of unjustified interference,

---

[53] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013).

[54] Compl. ¶¶ 3, 32, 43, 52, 56, 62-63.

[55] *See Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *33 (Del. Ch. Feb. 24, 2020) (Affiliate privilege doctrine summoned when the alleged tortfeasor "share[s] [a] common economic interest[] with a party to the contract." (internal quotation marks omitted)); *see also Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 589 (Del. Ch. 1994) (reasoning that the affiliate privilege doctrine undermines the "without justification" element in tortious interference claims).

[56] *See Shearin*, 652 A.2d at 589-91; *see also Surf's Up*, 2021 WL 117036, at *6-9 (explaining and applying the affiliate privilege doctrine and collecting pertinent authority).

[57] *See Bhole*, 67 A.3d at 453; *Shearin*, 652 A.2d at 591.

[58] *See Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2019 WL 4927053, at *25 (Del. Ch. Oct. 7, 2019) ("The tort of interference with contractual relations is intended to protect a promisee's economic interest in the performance of a contract by making actionable improper interference with the promisor's performance.   The adjective 'improper' is critical.   For participants in a competitive capitalist economy, some types of intentional interference are a legitimate part of doing business." (internal quotation marks and citations omitted)); *accord NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014) (same); *Shearin*, 652 A.2d at 591 ("[T]here can be no non-contractual liability to the affiliated corporation, which is privileged to consult and counsel with its affiliates, unless the plaintiff pleads . . . the affiliate sought not to achieve permissible financial goals but sought maliciously or in bad faith to injure plaintiff."); *see also Surf's Up*, 2021 WL 117036, at *6 ("The privilege supplies a defense

therefore, Delaware courts must "balance the important policies served by a claim for tortious interference with contract against the similarly important policies served by the corporate form."[59] That balance is struck to avoid endorsing haphazard *respondeat superior* theories and faulty approaches to corporate veil piercing.[60] The doctrine also serves to prevent judicial frustration of inter-firm consultation on matters of commercial significance.[61] Accordingly, to maintain a tortious

---

to overbroad attacks on the 'justification' element for a controller's involvement with its affiliates' contracts that might otherwise convert any of the controller's business judgments into personal guarantees." (citations omitted)); *Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, 2015 WL 394011, at *9 (Del. Ch. Jan. 29, 2015) (rejecting a tortious interference claim on affiliate privilege grounds and observing "[t]he standard for finding liability for controllers must 'be high or every-day consultation or direction between parent corporations and subsidiaries about contractual implementation would lead parents to be always brought into breach of contract cases.'" (quoting *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006))).

[59] *Bandera*, 2019 WL 4927053, at *26; *see Shearin*, 652 A.2d at 591 (observing that inter-firm "interference" is not necessarily improper unless the plaintiff demonstrates that it is (citation omitted)); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 667 (Del. Ch. 2012) ("[T]he separate legal existence of juridical entities is fundamental to Delaware law.").

[60] *Surf's Up*, 2021 WL 117036, at *7; *see Bandera*, 2019 WL 4927053, at *26 ("A party who wishes to have a parent entity or other controller backstop the obligations of the controlled entity can do so by contract, either by making the parent a party to the agreement or by obtaining a guarantee. A party should not be able to use a claim of tortious interference with contract to reap the benefits of protections that it did not obtain at the bargaining table."); *see also, e.g., Otto Candies, LLC v. KPMG, LLP*, 2020 WL 4917596, at *9-13 (Del. Ch. Aug. 21, 2020) (discussing the relationship between agency law and corporate veil piercing and the ways in which vicarious liability in tort and contract differ from direct liability imposed when the corporate veil is pierced); *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *5 (Del. Ch. Nov. 13, 2018) ("[A] true novelty would be to disregard the separateness of a parent and a subsidiary simply because a plaintiff would prefer to hold both liable for the subsidiary's breach of contract. Our law does not countenance this result."); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task" and counterparties should do so bilaterally if they wish (internal quotation marks omitted)).

[61] *Surf's Up*, 2021 WL 117036, at *6 (citing *Shearin*, 652 A.2d at 589-91); *accord NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) (In contract disputes, damages should be

interference claim against an affiliate of a contracting party, the complaint must allege facts to rebut the presumption that the non-party was "pursuing . . . legitimate profit seeking" goals "in good faith"[62]—"*i.e.*, by showing that the non-party's '*sole motive*' in interfering was 'bad faith to injure plaintiff.'"[63] Otherwise, the privilege shields an affiliate from primary or vicarious tort liability for the breach of a contract to which the affiliate itself was not a signatory.[64]

Buck's complaint does not meet this standard. He does not allege any act Novus took to interfere with the Membership Agreement, let alone an act the Court could infer was taken in bad faith. The only apparent nexus between Holdco's alleged breach and Novus is that the two entities share a common controller[65]— precisely the type of residual liability the privilege was intended to eliminate. Buck's bare legal conclusion that Novus meddled in "bad faith" "for the sole purpose of injuring [him],"[66] cannot undermine the presumption that any interference Novus

---

dictated, whenever possible, by the "predictability of the parties' agreement," rather than by any "far less certain, after-the-fact, judicially-fashioned tort remedy.").

[62] *Renco*, 2015 WL 394011, at *9 (emphasis in original); *Shearin*, 652 A.2d at 591.

[63] *Surf's Up*, 2021 WL 117036, at *7 (first quoting *WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (emphasis in original); then quoting *Bhole*, 67 A.3d at 453).

[64] *Surf's Up*, 2021 WL 117036, at *7; *see Bhole*, 67 A.3d at 453; *Shearin*, 652 A.2d at 591.

[65] *See, e.g.*, Compl. ¶¶ 3, 32, 43, 52, 56; *see also James Cable, LLC v. Millenium Digit. Media Sys., L.L.C.*, 2009 WL 1638634, at *4-5 (Del. Ch. June 11, 2009) (observing that two entities subject to common control are affiliates).

[66] *Id.* ¶ 62.

may have undertaken was justified economically.[67] Accordingly, because the privilege applies and this claim seeks to collapse two legally-separate firms into one,[68] the tortious interference claim also must be dismissed on the basis of the affiliate privilege.

## Conclusion

For the foregoing reasons, the Viking Entities' motion is **GRANTED** and Buck's complaint is **DISMISSED**. Buck's claims against Parent and his breach of contract and implied covenant claims against Novus are dismissed with prejudice, while his claims against Holdco and his tortious interference claim against Novus are dismissed without prejudice. **IT IS SO ORDERED.**

Sincerely,

Abigail M. LeGrow, Judge

---

[67] *See, e.g., Shearin,* 652 A.2d at 591; *see also Ramunno,* 705 A.2d at 1034 (Court can dismiss complaint when it relied on "conclusory allegations that lack specific supporting factual allegations.").

[68] *But see Surf's Up,* 2021 WL 117036, at *6 ("[I]t is primarily [these] scattergun approaches that ignore the legal distinctness inherent to the corporate personality that the privilege unloads." (citation omitted)).